QUINCEY MINING CO. v. KRAUSE et al.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1907.)

No. 1,590.

**1. PATENTS—ANTICIPATION—HYDRAULIC ORE SEPARATOR.**

The Krause patent, No. 681,234, for an improvement in ore crushers, consisting of a hydraulic separator for removing from the mortar, through a conduit leading from its side downwardly and having an upward flow of water therein, pieces of ore separated by the stamp, but which are too large to pass through the screen, *held* not anticipated by a prior separator, in which the conduit opened from above the mortar at the bottom of the screen. Also, *held* infringed.

**2. SAME—JOINT INVENTION.**

When a claim covers a series of steps or a number of elements in a combination, the invention may well be joint, though some of the steps or some of the elements may have come as the thought of one.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 124.]

Appeal from the Circuit Court of the United States for the Western District of Michigan.

This is a bill to enjoin infringement of patent No. 681,234, issued August 27, 1901, to C. H. and H. C. Krause, for an improvement in ore crushers. The late Judge Wanty sustained the validity of the patent, found infringement, and ordered usual accounting. From this interlocutory decree this appeal has been taken. The single issue is as to the validity of the Krause patent, and this depends entirely upon the novelty of the combination described in claim 1 of the patent. That claim reads as follows:

"In an ore crusher the combination with a stamp and mortar for crushing the ore and a screen through which the crushed ore is discharged by the splash from the stamp, of an auxiliary discharge for free metal too large to pass through the screen, consisting of a conduit leading downwardly out of said mortar and a water supply connection leading into said conduit and adapted to produce an upward current through the same, substantially as described."

The other claims stand or fall with claim 1, as claims which add certain well-known features to the combination of claim 1. The combination is well shown by the drawing of the patent, which is set out below:

The invention relates to a well-known character of machinery for crushing rock containing free metal. The patentees in their specifications say of the object sought:

"Our invention relates particularly to that class of ore crushers in which the crushed ore when it is reduced to the desired size is discharged by the splash of water through screens. The main objects of the invention are to remove pieces of free metal which are too large to pass through the screens in the ordinary way, to reduce the loss of metals in slimes and tailings, to increase the capacity of mills of this class, and to avoid accidents and injury to such mills by reason of the accumulation therein of large pieces of free metal."

In the drawing A is the mortar, B the stamp, and C the screen surrounding the bowl of the mortar. This mortar is provided with a hardened die and stave lining, and the stamp with a hardened shoe. The screen is surrounded by the "splash pan" or, "deflector," D, by which the crushed ore is deflected "after passing through the screen downwardly into a channel, a, formed in the mortar around the central cavity therein." In ore crushing mills, as long in use in the lake copper region for the purpose of separating the free copper inclosed in the rock, the ore is fed into the stamp mill along with water from an opening above and surrounding the stamp cylinder. When the rock is cracked by the blows of the heavy stamp, and the metal freed, both rock and metal are thrown violently in all directions against the surrounding screen. As usually constructed, the holes in the screens are $3/16$ inch in diameter. Consequently, no particle of rock or copper could pass through of a greater size. Those that did pass through were subjected to a sifting process, not necessary to describe. The specifications, after stating the matter to be remedied, proceed as follows:

"To avoid these difficulties and objections, we provide the mill with a discharge for removing from the mortar, as soon as they are separated from the rock, the flakes or chunks of metal that are too large to pass through the

screen, C. This discharge, as applied to a single-stamp mill of the kind shown in the drawing, consists of a descending conduit or passage, E, leading out through one side of the mortar and connected at its outer end by a pipe, F, with a pump, elevated tank, or other water supply arranged to produce through the passage, E, into the mortar an upward current of water of sufficient force to hold back rock and sand, while the heavier pieces of metal are allowed to descend by gravity against the inflowing current and escape from the mortar through said passage."

Passing some of the details of his discharge outlet, the specifications thereof state the operation of the device as follows:

"The device operates as follows: Normally, the upper valve, H, in the pipe, G, is open, the valve, I, is closed, and the rod, K, is withdrawn from the discharge-passage and stands in the position shown in the drawing. Under these conditions, when the stamp-mill is in operation, water is supplied through the pipe, F, and its flow through the passage, E, into the mortar it regulated so that the force of the current will hold back rock and sand in the mortar, but will allow the heavier pieces of metal to descend through said passage and drop into the lower end of the pipe, G, which serves as a trap for catching and holding a certain quantity of metal and preventing waste of water."

W. K. Richardson, for appellant.

Charles E. Pickard and John G. Stone, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, announced the opinion of the court.

There is no doubt about the great practical value of the Krause device, and none as to its novelty and patentability, unless it was anticipated by a device in actual use prior to the Krause application at one

Fig. 1.    Fig. 2.

A = Discharge Orifice
B = Mortar Bowl
C = Stave Liner
D = Screen

Fig. 3.    Fig. 4.

of the mills of the Calumet & Hecla Copper Mining Company. The contention is that a Mr. Woodbury, a metallurgical engineer in the service of the Calumet Company, devised and put in operation an auxiliary hydraulic separator in 1898, and improved the same from time to time, until by the summer of 1900 he had in successful operation a hydraulic separator which was an anticipation of that covered by the patent in suit. The application for the Krause patent was made March 11, 1901, and the patent issued August 27, 1901. No effort has been made to carry the invention behind the date of application. The single issue is, therefore, whether the Woodbury device, considered as a part of the prior art, is such an anticipation as to leave no room for the patent to Krause.

We need not stop to consider Woodbury's devices of 1898. They were mere steps which culminated in the device set up in the Calumet mill in May, 1900. Neither need we stop to consider the details in respect to the traps which make part of the outlet used by both inventors, with some slight but unimportant differences. The marked difference between the device of May, 1900, and that of the patent is in the location of the orifice of the auxiliary discharge.

Above we show four drawings taken from the brief of counsel for appellants which illustrate this feature. Figure 1 shows the location of the Krause discharge orifice, as illustrated by the drawings made part of their specifications. Figure 2 shows the infringing device used by the appellants, the Quincey Mining Company. The orifice is plainly in the side of the mortar, as in the Krause patent. Figure 4 shows the location of the outlet in the Woodbury device installed in May, 1900. The orifice is here shown entirely above the top of the mortar and at the foot of the screen. Figure 3 shows the location of the orifice in the improved device by Woodbury; the orifice being on line with the top of mortar and somewhat lowered from its earlier position. This device was not installed until November, 1901, which was a date subsequent to the actual issue of the Krause patent. In respect of this device, it is plain that, while the location is lowered from its former place, it does not enter the side of the mortar, and cannot obtain the advantages or any part of those peculiar to the Krause patent, except in so far as the sides of the mortar may be in effect carried up by a stacking or piling of the material above the top of the mortar, thus bringing some part of the mass in contact with an orifice the opening of which will thus be somewhat below the top of the materials to be dealt with, and not wholly dependent upon an interception of material deflected from the screen. But this feature of placing the orifice on a line with the top of the mortar is not shown to have been in use, or ever reduced to a working drawing, before Krause's application of March, 1901. When this last form was planned is not shown. The burden was upon the defendants to show a date antecedent to Krause. This they have not done. Hydraulic separators were not new, but old in the mineralogical arts. The principle applied by both Woodbury and Krause was that, if pieces of copper metal, which are heavy, and pieces of rock, which are comparatively light, are drawn into a downward discharge pipe through which a strong upward current of water is rushing, the lighter pieces, such as rock, sand, or silt, will be kept back,

while the heavier particles, such as nuggets or lumps of copper, will pass down, despite the upward current. The difference between the application which these two inventors made of this old method of hydraulic separation to meet a well-known condition was that Woodbury undertook to deal only with such particles of rock and metal as should fall from the screen into a discharge orifice at its foot. The Krauses, on the other hand, conceived that, if the orifice of an auxiliary outlet should be placed below the foot of the screen and below the top of the mortar, and within the side of the mortar itself, a separation of all the copper not passed through the screens would be brought about. Thus the patentees proposed to deal with the copper within the mortar bowl, whether it should be copper thrown back from the screens because too large to pass the holes, or copper in lumps too heavy to be thrown over the top of the mortar and against the screen separator. This was a new and original idea. Nothing in the old art shows an hydraulic auxiliary separator opening directly into the mass of materials to be operated upon. Woodbury had stopped with an effort to catch and separate copper particles which should fall into his openings at the foot of the screen. His plan, beyond doubt, was useful, and saved some copper and some time by lessening to that extent the accumulations of copper in the mortar too large to pass through the screen; still he had by no means remedied the waste incident to the use of the screen separator alone. His plan was auxiliary to the screen, and dealt alone with pieces which should fall from the screen into his orifice. It is conceivable that much material which was projected by concussion against the screen would not be deflected at such an angle as to fall into boxes with holes at foot of the screen, but would pass over such foot ledge into the cavity of the mortar. It is also conceivable, that pieces of metal too heavy to be thrown against the screen at all would occur. What could Woodbury do in either case? True, in time, pieces might be thrown again and again against the screen, until finally they should fall into an orifice at its foot. True, that pieces too heavy to be thrown against the screen would, in time, although malleable, become so lessened in weight by abrasion as to be thrown against the the screen and by same cause so diminished in bulk as to at last go through the holes of the screen itself.

But the objects to be accomplished were two: First, to prevent, to a degree, the clogging of the mill by the accumulation of large pieces of copper, which, by mere weight, would find their way to the bottom of the mortar and require a stopping of the mill and removal by pick and hand; and, second, to prevent loss of copper from unnecessary abrasion. Woodbury undoubtedly did something of value. Krause did more, and he did it by a conception which is not suggested by anything which Woodbury had done. It was a long step from an auxiliary hydraulic separator, whose downward passage was placed at the foot of the screen, and could deal only with such particles of copper which should fall into it off of the screen, to the location of the inlet of such a downward conduit in the very midst of the mass of materials in the cavity of the mortar. The latter was a bold idea. The former was commonplace. Treating it as only another step in the direction pointed out by Woodbury, it was a step which involved an idea, and not a mere

workman's judgment of the best locality for a discharge outlet. Within the limits of the top and bottom of the mortar bowl of such a mill, there may be some room for the exercise of ordinary mechanical judgment as to just where to place such an orifice. But the thought of placing the orifice of such an auxiliary outlet in the midst of the mass of material being operated upon, with the view of so managing a strong upward stream as to keep back the rock and take out the metal, was novel and of great utility in saving both copper and time. But it is said that the inventors in their specifications do not refer to any advantages resulting from the location of their outlet in the side of the mortar, and the suggestion is that for this reason the patent cannot be saved over an anticipation which placed the auxiliary orifice above the mortar. But, if this be so, it does not by any means justify an inference that the advantages of such a location were not well understood by the Krauses. Indeed, the evidence shows that their experiments began with a location above the mortar bowl. This they discarded for a location in the side of the mortar.

In describing their invention, the specifications include as one element of their device "a descending conduit or passage, E, leading out through one side of the mortar." The drawing shows this outlet, opening into the bowl, somewhat nearer the bottom than the top of the mortar cavity. In the claim this discharge conduit is described as "leading downwardly out of said mortar." Now, the mortar is one thing. The screen is above the mortar and quite another element. We must read the claim in connection with the drawing and specifications, and, when we find the claim calling for a downward passage leading "out of said mortar," we have no authority for saying that the advantages of this location were not well understood, even if that is important when the claim and specifications show a location possessing the advantages.

It is next said that the evidence tends to show that this idea of placing the outlet inside of the mortar was the thought of but one of the patentees, and therefore could not be the subject of a joint patent. If a claim covered but a single idea, it would be difficult to conceive how it could be patented by two; but, when a claim covers a series of steps or a number of elements in a combination, the invention may well be joint, though some of the steps or some of the elements may have come as the thought of but one. Such is the invention here patented, and it would not be fatal to this patent if the fact is that Krause, Sr., gave birth to the best thought connected with a combination claim—which covers more than the place of the location of the discharge outlet. This distinction is drawn in Welsbach Light Co. v. Cosmopolitan Incandescent Light Co., 104 Fed. 83, 86, 43 C. C. A. 418. But it is by no means shown that Krause, Sr., alone solved the problem to be dealt with. The evidence relied upon is altogether too meager to overthrow a patent. To destroy a patent granted for a joint invention, upon the ground that it was the invention of only one of the patentees, would require very clear evidence of a very reliable character. That has not been produced.

The decree sustaining the patent must be affirmed, and the cause will be remanded for further proceedings.