## ALTOONA PUBLIX THEATRES, Inc., et al. v. AMERICAN TRI-ERGON CORPORATION et al.[*]

### Nos. 5392, 5393.

Circuit Court of Appeals, Third Circuit.

June 13, 1934.

As Corrected Aug. 6, 1934.

See, also (D. C.) 2 F. Supp. 512.

Charles Neave, of New York City, Isaac D. Levy, of Philadelphia, Pa., Henry R. Ashton, of New York City, and Reese H. Harris, of Scranton, Pa., for appellants.

Hugh M. Morris, of Wilmington, Del., S. Mortimer Ward, Jr., and Page S. Haselton, both of New York City, and Morgan S. Kaufman and Philip V. Mattes, both of Scranton, Pa., for appellees.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

These are appeals from two decrees of the District Court holding claims 5, 7, 9, 13, 17, 18, and 19, of United States Patent No. 1,713,726, valid and infringed.

The main contest below and here is on the validity of the claims in suit. If they are valid, infringement, while not admitted, is rather feebly pressed. The patent, including the claims in issue, is presumptively valid, both as to novelty and utility. Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939; Johnson Automobile Lock Co. v. Noser Instant Auto Lock Co. (C. C. A.) 9 F.(2d) 265, 267; Galvin Electric Mfg. Co. v. Emerson Electric Mfg. Co. (C. C. A.) 19 F.(2d) 885. This follows from the grant of the patent by the Commissioner of Patents and the finding of

[*]Writ of certiorari denied 55 S. Ct. 101, 79 L. Ed. —, order vacated and writ of certiorari granted 55 S. Ct. 139, 79 L. Ed. —.

the District Judge. Apparently extrinsic evidence was necessary to explain the terms and state of the art, and after hearing in open court that evidence, much of which was conflicting and directly contradictory, the trial judge, upon extensive findings of fact and conclusions of law, held the claims in issue to be valid and infringed. We could affirm the decree upon his able and comprehensive opinion. Where facts have been found by a proper party or tribunal, a decree based thereon will not be reversed by an appellate court unless it is obvious that a plain mistake has been made: Tilghman v. Proctor, 125 U. S. 136, 149, 8 S. Ct. 894, 31 L. Ed. 664; Crawford v. Neal, 144 U. S. 585, 12 S. Ct. 759, 36 L. Ed. 552; Furrer v. Ferris, 145 U. S. 132, 12 S. Ct. 821, 36 L. Ed. 649; Davis v. Schwartz, 155 U. S. 631, 636, 15 S. Ct. 237, 39 L. Ed 289; Hutchins v. Munn, 209 U. S. 246, 250, 28 S. Ct. 504, 52 L. Ed. 776. No such mistake appears here. However, we have decided to state our own conclusions upon the facts and the law.

The patent deals with recording photographic sound on film and the reproduction therefrom for use in talking moving pictures as distinguished from recording and reproducing sound on disk which had long been used on phonographs. The patent contains both apparatus and method claims. Of the claims in issue, claims 5, 7, 13, and 17 are for an apparatus, and claims 9, 18, and 19 are for a method.

The art of photographic sound recording involves the translation of light upon a photographic film. Reproduction therefrom involves translation of the sound record on such a film into accoustically modulated electric currents through the medium of light. The patentees do not claim to be the first to have conceived this idea. However that may be, the practical problem was how to utilize it in overcoming distortion in reproducing sound in talking moving pictures.

Ruhmer, the German scientist, had the idea and tried to solve the problem of using it in the production of talking moving pictures, but without success, and his abandoned experiments are recognized as only a crude beginning of what the patentees after years of patient research accomplished. Edison also had the idea, but his efforts, culminating in the use of a cylinder phonogram, synchronized with a picture machine, failed to produce any results that had any effect upon the art. Others tried and failed. The patentees working together for years on this problem finally solved it and gave to the world a machine and method which revolutionized the moving picture art and drove "sound on disk sound pictures from the market."

The inventors had to overcome many difficulties before they successfully produced and translated sound on film sound pictures. One of the difficulties was to overcome what is called "distortion" of sound. Records on picture film contain many hundreds per inch of precisely placed photographic fine lines varying in frequency and transparency according to complex sound vibrations. In order to record sound without distortion, the spacing and transparency of these lines must vary precisely in accordance with the accoustically modulated light which is being photographed. In the reproducing machine, these fine photographic lines must be rapidly moved without disturbance of their frequency relationship through a focused beam of light at the point of sound translation, the light being varied according to the sound record. This accoustically modulated light shines on what is known as the photo-electric cell which converts the light variations into modulated electric currents which vary in proportion to the light variations. These light variations in turn vary according to the spacing and degree of the transparency of the photographed lines.

Light acts without inertia or friction and so does not distort the most complex and rapid sound vibrations. Attempts to use a beam of light for sound reproductions were futile before this invention, because of the presence of many disturbing factors such as irregular, intermittent, and vibratory movement of the film at the translation point caused mainly by take-up reels, driving gear, imperfect meshing of the sprocket with the perforations in the film and the varying friction and irregular deflections of the film in the "straight light gate." These had never been segregated and diagnosed and then collectively remedied, until the patentees did it.

They discovered that this photo-electric cell acts without inertia in co-operation with the light beam, and that the rapidly moving, flimsy, curling film must be uniform in its movements and so controlled that the position and motion of each fine line at the beam of light must be accurate within the thousandth of an inch per small fraction of a second. Unless this is so, the synchronism between the sound and movements, in talking moving pictures, is destroyed and the reproduction a failure.

In the place of the "straight light gate," they eliminated the troublesome transverse curling and irregular buckling of the film at

the sprocket perforations by arcuately bending the film longitudinally. This gave firmness to the film at the focal point of the optical system, permitted it to be free from physical supports which accumulated dust and scratched and displaced the film. They thus prevented vibrations.

The well-known function of a flywheel is to give uniformity of motion by absorbing energy when speed is increased and by releasing it when speed is decreased, but this knowledge was not enough to solve the problem of preventing sound distortion in recording sound on film and in reproducing the same for which uniformity of motion is absolutely necessary. The patentees utilized this knowledge of the function of a flywheel which they made an element of their new combination in order to secure the necessary uniform motion of the flimsy film as it passed over the sound head. This small piece of trembling flimsy film, without appreciable weight, charged with the vibrations as it comes from the adjacent intermittent movements of the picture machine, traveling over the sound head at the speed of 90 feet per minute, required a uniformity measured in thousandths of an inch per small fraction of a second in order to accomplish successfully photographic sound in film reproduction by the use of extremely fine transverse lines of light. The flywheel, as used in this combination, does not attempt to regulate the irregularities of the motor and other rotating parts of the picture machine. It regulates only the small length of the film which is passing over the roller at the translation point and gives it the steadiness and uniformity of the speed which it itself possesses.

The effectiveness of the flywheel in producing uniformity of speed and in preventing irregularities and consequent distortion of sound was increased by the use of the flexible spring connection between the driving means and a flywheel shaft. While springs and elastic couplings were old, yet in this new combination it was an element which was instrumental in producing the uniformity of rotation which was never secured in the prior art.

Again they used a focused fine line of light, called an "optical slit," through which light penetrated to record and reproduce sound. This takes the place of the old mechanical slit located directly against the film in which dust and dirt collected, obstructing light and scratching the sound record.

The prior art does not disclose this combination nor the result which it produced.

The evidence shows that the moving talking picture art was looking for something like this. The defendants point to some 70 patents, some having one element of the patent in issue, and some another, but none have this combination and none produce the result of this combination. The patentees were the first to accomplish successfully and commercially photographic sound on film reproduction. The suggestions and prophecies found in paper patents were confusing and not helpful.

This new combination of the patent was not obvious to one skilled in the art, for no one else had discovered it, although many were working on it, and it required years of patient study and research before the patentees were able to work out this combination and method, although some of the individual elements were old; one being found here and another there in inoperative paper patents. The defendants were unable to produce a single anticipation among the 70 or more paper patents upon which they relied.

The trial judge said that the combination and methods of the claims of the patent in issue are not found in any prior art citations, and are new and useful. A close study of the citations confirm this finding. No one before the patentees was able to bring together all the elements of the patent into a successfully operative combination. Each of these elements coact directly with the others to produce a new and useful result; the prevention of sound distortion. It is well settled that a new combination, every element of which is old, is patentable if it produces a new and useful result, or an old result in a "new and materially better way," or an "old result in a more advantageous way." Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Binder Co. (C. C. A.) 230 F. 120, 127; Galvin Electric Mfg. Co. v. Emerson Electric Mfg. Co. (C. C. A.) 19 F.(2d) 885, 890; Hailes v. Van Wormer, 20 Wall. (87 U. S.) 353, 22 L. Ed. 241; Palmer v. Corning, 156 U. S. 342, 345, 15 S. Ct. 381, 39 L. Ed. 445; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U. S. 426, 432, 38 S. Ct. 547, 62 L. Ed. 1196. The patent in issue unquestionably comes within the law as thus declared.

The old cylinder or disk gramaphones had flywheels or speed regulators as the patent states, but the problem there was very different from the problem here, where uniformity of speed is so absolutely necessary to reproduce photographic sound on film which is so highly sensitive to the many sourc-

es of irregularity of speed. To give uniform speed to each short piece of film, so light and flimsy that it is practically weightless, as it passes over the sound head, was the problem which the patentees alone successfully solved.

All that need to be done in order to show that the patent in suit is an entirely new combination and accomplished a new and useful result is to read and study the patent itself and then read and study any or all of the prior art patents relied on by appellants.

Defendants allege that the findings of fact made by the court are inconsistent; that those made in their favor are inconsistent with those made in favor of the plaintiffs.

These findings were presented to the court and requested by the parties respectively. Those specially referred to by defendants relate to the well-known function of flywheels generally and are not inconsistent with the findings in favor of plaintiffs when considered in connection with the combination of the patent.

One of the defenses raised by the appellants is that the invention is not a joint invention of the three patentees.

The first question arises as to what constitutes joint invention of two or more persons. The authorities are unanimous in holding that joint inventions are made when two or more persons jointly work or collaborate in devising and putting into practical form the subject-matter of the patent in question. Robinson on Patents, vol. 1, p. 567, says:

"It is not necessary that the same idea should occur simultaneously to each. On the contrary, it is immaterial who first conceives any particular theory or plan of the invention or in what order the development of its subordinate ideas proceeds. Where two or more inventors have agreed that a result, if it could be achieved, would be desirable, neither as yet having attempted to provide a means, and from this point go forward by mutual consultations and suggestions to devise one, the means devised becomes a joint invention. * * * In short, wherever, before the entire conception of the invention by one inventor, another meets him and by his consent unites with him in exercising inventive skill upon the development and perfecting of the conception, the product of their joint endeavor is a joint invention. * * *

"The same variety is possible in the exterior relations of the joint inventors, where the inventive act consists in the repeated trial of experiments. The exact part which each performs is of no consequence. Nor does it matter that one has been experimenting long in vain, nor even that he may have made some actual advance toward the discovery to which he aspires. It is enough if the experiment which finally succeeds—the one which demonstrates the practicability of accomplishing the end in view and indicates the means by which it is attainable—has been conducted under their united supervision, and in accordance with ideas and theories to which both have contributed."

In the case of William R. Thropp & Sons Co. v. De Laski & Thropp Circular Woven Tire Co. (C. C. A.) 226 F. 941, 949, Judge Woolley, speaking for this court said:

"In a machine containing as many elements as this one, it is not to be thought nor by the law required, that the inventive conceptions of two inventors shall develop simultaneously. One may conceive a general or imperfect outline of an entirely novel thing, which, without the conception of another developing it and giving it body, might never amount to invention; but if the conceptions of one supplement and complement the conceptions of the other, the result might be invention and therefore joint invention. 'When a claim covers a series of steps or a number of elements in a combination, the invention may well be joint, though some of the steps or some of the elements may have come as the thought of but one.' Quincey Mining Co. v. Krause, 151 F. 1012, 1017, 81 C. C. A. 290; American Patent Diamond Dop Co. v. Wood et al. (C. C.) 189 F. 391, 395. In this case we do not have to resolve doubts in favor of the patent under the rule which requires unquestionable proof that joint patentees are not joint inventors. United Shirt & Collar Co. v. Beattie, 149 F. 736, 741, 79 C. C. A. 442; Butler v. Bainbridge (C. C.) 29 F. 142, 143; Priestley v. Montague (C. C.) 47 F. 650, 651."

"It may be considered as well settled that in order to constitute persons joint inventors, it is not necessary that exactly the same idea should have occurred to each at the same time, and that they should work out together the embodiment of that idea in a perfected machine. One may be a joint inventor, even though the conception of the entire device may be due to another if he makes suggestions of practical value which assisted in working out the main idea and making it operative, or contributes an independent part of the entire invention, which is united with the parts produced by the other and creates the whole." 48 Corpus Juris, 120, Sec. 134, citing many cases, among them Worden v. Fisher (C. C.) 11 F. 505, 508, where Judge Brown said:

"If an idea is suggested to one, and he even goes so far as to construct a machine embodying this idea, but it is not a completed and working machine, and another person takes hold of it, and by their joint labors, one suggesting one thing and the other another, a perfect machine is made, a joint patent may properly issue to them."

These extracts epitomize the authorities from text-books and decisions on this subject.

The undisputed testimony shows that no one of the inventors had ever done any work in sound recording or reproducing prior to the time when they came together in 1918, pooled their interests, and entered into an agreement to work together. This being true, they further agreed that no one of them would file an application in sound work in his own name, which was natural and logical, since they had agreed to work together, and since they were to work together, supplementing each others' ideas, work, and experience, the arrangement among them as to filing applications was perhaps a wise one in order to prevent internal strife as to how much the invention in any case was due to any one of them. If they did so work, and the evidence shows that they did, they filed the application in the only way in which they legally could. All three of these men worked together every day during a number of years, and discussed matters relating to their work, sometimes in adjoining rooms and sometimes in the same room around the same table, conferring and exchanging ideas and using a common notebook; one suggesting and doing one thing and the other suggesting another thing; one supplementing the work of the other two. This related to the removal of the flywheel, to the photo-electric cell and the whole combination. "These inventions * * * we spoke about were made conjointly by the three inventors," said Dr. Engl.

While the testimony does not show the specific work which each coinventor performed, nor the extent of it, yet it does show, and that without contradiction, that the three of them were jointly working together as one man daily, each contributing his part toward the invention.

True, it is, that the appellants introduced in evidence, over objection, an article purporting to be a review of some statements or comments alleged to have been made by one of the three, Vogt, to the effect that he had made three inventions, one of which was the German patent, No. 387,058, which appellants contend is the same as the patent here involved. There was no testimony about this article and whether or not Vogt actually made any comments, and, if he did, just what they were, has not been legally established. The trial court admitted the article with the limitation that it was evidence only of its own existence and not of the truth of the statements therein contained. But Vogt is alleged to have written another article in 1926, vol. 5, p. 1641, in which it is stated with reference to the invention here that "the necessary labors were carried out" by him and his two associates "during the period from 1918 to 1924 in equal participation." This completely neutralizes the weight, if any, to be given to the earlier statements, but in fact no weight should be given to either.

The appellants further allege that appellees tried to prevent them from securing certain facts from Vogt, but the record shows that they were trying to secure facts which under the law of Germany they were not entitled to have, and that some one tried to bribe Vogt. A German court enjoined him from disclosing what he should not. There was a legal way for appellants to secure any information which Vogt had, and not only any information that Vogt could give them, but also any facts which Massole, the third joint inventor, knew, if they really had desired it, for neither Vogt nor Massole is in any way connected with the Tri-Ergon Corporation. His or their deposition could have been taken on notice, or they could have been brought over here to testify at the trial, but appellants did neither, and, so far as the record goes, they did not even attempt to do so. They chose rather to rest on innuendoes and insinuations. This does not overcome, first, the presumption of genuine joint invention by the three persons who signed the application and swore that they had jointly worked out the invention, and, second, the unequivocal testimony of Dr. Engl that they jointly invented the apparatus and methods here involved. Under any fair interpretation of the evidence and proper application of the law thereto, this defense must fail.

Another defense relied upon by appellants is that the United States patent is for the same invention as the German patent, No. 387,058.

If this is so, the application for the United States patent was not filed in time and it is accordingly invalid. In order to show that the inventions, though similar, are really very different, the appellees submitted an interlined copy of the claims in issue, together with the disclaimer, showing the features contained in the United States patent which were not disclosed in the German patent, and also

the features disclosed in the German patent but not claimed therein.

In claim 5 the patentees claim a *"toothed cylinder over a portion"* (of the periphery of which the ribbon or film passes and) *"the teeth of said cylinder engaging * * *"* (the perforations of the ribbon) of *"said cylinder."* The above-quoted italicized provisions are not contained in the German patent. This refers to the toothed cylinder "r" in Fig. 1. In the specifications this toothed cylinder is called a "sprocket," and the film passes over a portion of its periphery adjacent the translation point. At the same time the teeth of the cylinder engage in the perforations of the ribbon or film which moves uniformly by or over the translation point. The film is wrapped over or about a portion of this toothed cylinder adjacent the translation point, and the engaging of the perforations in the film with the teeth of the cylinder harness, as it were, the film to the flywheel, so that the two move as one without any slippage. The German patent neither disclosed nor claimed a toothed cylinder nor any cylinder around which the film is thus wrapped to harness the film and flywheel. Instead, the German patent discloses a pair of smooth rollers with which the film has a mere tangential contact which cannot operatively harness the flywheel and film to cause the film to move as one with the flywheel to give it the necessary uniformity of movement.

In claim 7, the combination includes a cylinder *"over a portion of the periphery of which"* the carrier passes, and a driving member *"coaxial with said shaft, a resilient connection between said driving member and flywheel and stop means for limiting the amount of yielding of said resilient connection."* The German patent neither disclosed nor claimed the above-quoted portions.

The "driving member" is the arm represented by the numeral 2 in Fig. 5, and is coaxial with the shaft that connects the "flywheel" and the "cylinder," "over a portion of the periphery of which" the film passes.

The "resilient connection" is the spring represented by the numeral 3 in Fig. 5, and is used between the flywheel and its driving member, to prevent any irregularities in the motor, or gearing between the motor and the flywheel. The flywheel thus runs more uniformly and smoothly and imparts its own uniformity and smoothness of motion to the film.

The *"stop means"* for limiting the amount of "yielding" or stretching of the spring are

represented by the numerals 5, 5 in Fig. 5. In starting and stopping the machine, the arm 2 pulls upon the spring and stretches it until the arm rests against the stops 5—5. After the machine gets up speed, the flywheel runs largely under its own momentum, the tension on the spring is released, and it no longer comes into engagement with the stops. Thereafter the little power required to keep the flywheel running is transmitted to it through the spring.

Claim 9 is a method claim and refers to the translation of sound from a film record *"which comprises flexing the film arcuately longitudinally at the point of translation"* and rapidly and uniformly moving the film "in a circumferential direction" past said point.

The element of this claim not disclosed in the German patent is the arcuate bending feature of the film secured by passing the film over an arched or curved surface at the translation point. The important purpose of this longitudinal bending is to hold the film in exact focus for the recording and reproducing line of light which impinges on the film.

Longitudinal bending, as stated above, prevents the film from curling transversely, as it is naturally inclined to do, avoids depressions, and keeps the sound track portion of the film in focus.

In claim 13 it is stated that: *"The space between said lens and the film being free of obstructions to said light."* This element not disclosed by the German patent is directed to the idea that there is no physical slit or other obstruction between the lens projecting the light line and the film. If any obstruction were close to the film it would gather dirt and scratch the film and interfere with the transmission of the width of the light line as projected, such as would be caused by a mechanical slit.

In the disclaimer of claim 17, it is provided that *"a substantial portion of the periphery of the cylinder is in contact with the carrier in its travel from the intermediate point to said sprocket."*

This is not disclosed in the German patent and refers to the arrangement where the film lies in contact with a substantial portion of the periphery of the flywheel cylinder in the travel of the film from the translation point to the feeding sprocket as illustrated in Fig. 2 of the patent. The function of this element is to smooth out any small irregularities or vibrations that might otherwise be transmitted along the length of the film from the feeding sprocket to the translation point.

In claim 19 the film "is *yieldingly pressed into contact with a supporting area immediately adjacent the point of translation, such pressure cooperating with the inertia control in the elimination of irregularities in the film motion.*"

The feed sprocket may set up very fine irregularities in the length of the film between the feed sprocket and the translation point. This is prevented by the spring-pressed rollers $dr^1$ and $dr^2$ in Fig. 2 of the patent. This element is not disclosed in the German patent.

■ There are many features disclosed in the German patent which are not claimed, and in law the patent stands as though the features were not disclosed. Davis-Bournonville Co. v. Alexander Milburn Co. (C. C. A.) 1 F.(2d) 227, 230.

■ All of the above-mentioned elements, not disclosed in the German patent, coact with all the others in the combination. If they were eliminated, the results of the combination could not be obtained. It is evident that we have in this patent a combination and method not disclosed in the German patent.

All the other defenses have been considered, but we think that they are not substantial, and the decree is affirmed.