**HALL v. SHIMADZU (two cases).**
**Nos. 2982, 2983.**

Court of Customs and Patent Appeals.
June 20, 1932.

Edward S. W. Farnum, Jr., and Augustus B. Stoughton, both of Philadelphia, Pa., for Hall.

J. T. Newton and Marks & Clerk, all of Washington, D. C. (E. B. Whitcomb and Braselton, Whitcomb & Davies, all of Toledo, Ohio, of counsel), for Shimadzu.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

These are appeals in two interference proceedings from decisions of the Board of Appeals of the United States Patent Office, awarding priority of invention in each interference to appellee. Interference No. 54,798 is involved in the first appeal, being appeal No. 2982, while interference No. 56,224 is involved in the other appeal, being appeal No. 2983. For the purposes of the hearing before us, the records in both interferences were consolidated.

Inasmuch as the principal questions involved in each of these appeals are common to both cases, we shall dispose of both appeals in one opinion.

Interference No. 54,798.

█ The invention herein involved relates to a product which has as its essential ingredient the substance suboxide of lead, and a process for making the same. In this interference the issue is stated in eight counts, of which the following are illustrative:

"1. A process of manufacturing a fine powder of lead suboxide intermingled with powder of metallic lead, comprising in putting in a rotatable vessel pieces of metallic lead, introducing air thereinto and rotating the vessel maintaining the temperature of the material at not less than 60° C. by the heat generated by friction and chemical reaction.

"2. Comminuted lead—lead suboxide mixture with apparent specific gravity 1 to 3.

"3. As a new composition of matter, a highly chemically reactive powder, comprising a large portion of lead suboxide, said powder being capable of spontaneous reaction on contact with moisture."

"5. A process of manufacturing a fine powder of lead suboxide intermingled with a powder of metallic lead, comprising in putting in a rotatable vessel pieces of metallic lead in a dry state, introducing into the said vessel while rotating blasts of a gas containing oxygen, such as air, causing such blast to blow the powder produced out of the vessel."

The issue involves patent No. 1,584,150, of May 11, 1926, issued to appellee upon an application therefor filed July 14, 1923, and appellant's application was filed March 29, 1924, which application was allowed, forfeited, and renewed on December 24, 1926. While the record is very indefinite with respect to any added claims included in the application of appellant when renewed on December 24, 1926, it seems to be conceded by the parties that, at the time of such renewal, appellant copied claims 6, 14, 16, and 17 from appellee's said patent, and added them to his renewed application. These claims became counts 1, 2, 3, and 4 of the interference before us, which was declared on January 20, 1927.

Thereafter appellee moved to dissolve the interference upon the ground that appellant had no right to make claims corresponding to said counts. At the same time appellant moved to amend his application by adding thereto certain other claims taken from the said patent to Shimadzu, included among which were claims corresponding to Shimadzu claims 2, 3, 4, and 15. Appellee's motion to dissolve was denied, and appellant's motion to amend was allowed with respect to the claims corresponding to said Shimadzu claims 2, 3, 4, and 15. Thereafter the interference was amended by adding thereto counts 5, 6, 7, and 8, corresponding to said Shimadzu claims 2, 3, 4, and 15. Thus it appears that all of the counts of the interference were copied from the Shimadzu patent.

In his decision denying appellee's motion to dissolve the interference, the Law Examiner said: "The motion to dissolve attacks Hall's disclosure largely for the reason that he does not disclose lead suboxide, $Pb_2O$. He does not refer to lead suboxide by name and it must be determined if he has sufficiently identified a material which would be recognized by chemists as lead suboxide so that he would be allowed to give his material that name. * * *"

The Law Examiner thereupon entered upon a detailed discussion of appellant's disclosure, and came to the conclusion that the process disclosed by him would result in the production of lead suboxide, and that therefore appellant was entitled to make the claims.

Thereafter both parties took testimony.

In his preliminary statement, appellant alleged conception of the invention set forth in the counts on or about July, 1920, and reduction to practice in January, 1921.

While the preliminary statement of appellee alleged conception and reduction to practice prior to his filing date of July 14, 1923, both the Examiner of Interferences and the Board of Appeals held him to said filing date for both conception and reduction to practice. In view of the conclusions we have reached, it is unnecessary to examine the action of the Patent Office tribunals on this point.

The testimony shows that appellee set up a Harding mill at Depew, N. Y. for experimentation; it appearing from appellant's disclosure that he used a Hardinge mill in carrying out his process. Testimony on behalf of appellee, including that of witnesses who were chemical experts, is to the effect that the process described by appellant in his disclosure was carefully carried out at Depew, as a result of which about 77 pounds of olive gray powder was secured, which is the color of the powder described in appellant's disclosure, but that none of such powder contained an appreciable amount of lead suboxide, it being mainly composed of lead monoxide or litharge.

The tribunals of the Patent Office apparently found such testimony to be of sufficient weight to cause them to come to a different conclusion than that reached by the Law Examiner in his decision, and both tribunals held that appellant's specification, as originally filed, does not warrant claims corresponding to the counts here in issue; that appellant has no right to make the claims; that the process disclosed by appellant does not produce a substantial amount of suboxide and powdered lead as required by the counts, and both tribunals further found that appellant was not sufficiently corroborated as to conception and reduction to practice, which appellant attempted to establish as prior to appellee's filing date. Accordingly, the Board of Appeals concurred with the Examiner in awarding priority of invention to appellee.

Appellant here makes three principal contentions. The first is that, as to counts 1, 5, 6, and 7, the language first appearing in said counts—"a process of manufacturing a fine powder of lead suboxide intermingled with powder of metallic lead"—should be construed as an introductory phrase merely, and that it cannot be considered in construing said counts. In this contention appellant relies upon our decision in the case of Braren v. Horner, 47 F.(2d) 358, 364, 18 C. C. P. A. 971, in which case we held that the introductory phrase in the counts there involved, reading, "In an engraving machine and the

like," could not be considered as a part of the subject-matter of the counts. Generally speaking, it is well established that an introductory phrase will not be considered as a part of the subject-matter of a claim, but there are exceptions to this rule, and this was recognized in our opinion in said case where, speaking through Presiding Judge Graham, we said: " * * * It is true, as stated by the examiner of interferences, that in some cases courts have held that similar introductory words should be considered as limitations. However, we think it may be safely said that in all such cases an examination of the facts disclosed by the record will show that the words thus considered as limitations were an essential element in the novelty of the device and of the invention in issue there. No such contention is properly made here, as it is obvious that if there be intention, it is not in the construction of an engraving or similar machine, but in the drive by which such machine is operated."

With reference to the counts here in issue, we think that the phrase here under consideration is more than merely an introductory phrase, and is absolutely essential to point out the invention that is here involved.

In the case of Schram Glass Co. v. Homer Brooke Glass Co. (C. C. A.) 249 F. 228, 229, there was involved the construction of the following phrase: "An automatic device for cutting or separating an unsupported freely flowing stream of molten material into unformed molten masses." In its opinion the court said: " * * * While it is true that this clause of itself does not describe an element in the combination, it should not for that reason be ignored. Each of the elements of the combination should be read in the light of this clause and should be modified by it. Such a clause of itself may entirely fail to supply a necessary element in a combination (Morgan Envelope Co. v. A. P. W. Co., 152 U. S. 425, 14 S. Ct. 627, 38 L. Ed. 500) yet it may so affect the enumerated elements as to give life and meaning and vitality to them, as they appear in the combination. * * *"

So here surely it cannot be said that a process which will not result in the production of suboxide of lead, if such be the fact, is the same invention as a process that will produce it. The production of suboxide of lead is the very heart of each of the counts where the phrase under consideration occurs, and this phrase is necessary "to give life and meaning and vitality" to the counts, and we are clear that, in determining the question of whether or not the process disclosed by appellant involves the same invention as that disclosed by appellee, this phrase must be considered. Furthermore, it must be borne in mind that appellant's claims, corresponding to the counts in issue, were all copied from appellee's patent, and the production of suboxide of lead is the whole purpose of appellee's process, while in appellant's disclosure, as originally filed, the words "suboxide of lead" are nowhere found.

Appellant's next contention is that little or no weight should be given to the tests of appellant's process conducted by appellee, for the reason that such tests were made without notice to appellant and without his presence when the same were made. Appellant cites many cases to the point that little or no weight should be given to ex parte tests or demonstrations, and some cases to the point that no weight should be given to experiments made by one party in the absence of the other.

We should be inclined to agree with appellant that little or no weight should be given to these tests, were it not for the fact that, as the record shows, before the taking of any testimony upon behalf of appellee, and during the cross-examination of appellant, appellant was invited by appellee's counsel to visit the testing plant set up by appellee and operate it himself, and that appellant declined to do so; that during the taking of testimony upon behalf of appellee a second invitation was extended to appellant to visit Depew, examine the mill that had been set up for purposes of the tests, and observe its operation, but appellant did not accept this invitation; later, during the taking of testimony by appellee, a third invitation was extended to appellant to go to Depew and observe the machine operate, and in this third invitation appellee offered to pay the expenses of appellant if he would do so; this invitation, like the others, was not accepted. We think this so important that we quote from the record the evidence of these invitations, as follows:

"X-Q. 146. Mr. Hall, to be perfectly frank with you, we have duplicated your apparatus at Buffalo and we cannot get it to work according to your specifications. Would you be willing to go up there and operate that machine?

"Mr. Stoughton [counsel for Hall]: It is perfectly well known that it is very easy to show how not to do a thing. The entire suggestion is objected to as immaterial and irrelevant and the witness is instructed he can use his own judgment about going up there and complying with the request. To

my mind, there is no legal process by which he can be required to go to Buffalo and play with some apparatus that is supposed to be something like what is in his application. You can answer the question.

"The Witness: What was the question? (The last question was then read by the stenographer.) A. No, sir. * * *

"Mr. Newton [counsel for Shimadzu]: It is now desired to put upon the record the fact that in cross examination of Mr. Hall on October 4th, 1928, Mr. Hall was requested to visit the mill that we had erected and which we thought was a reproduction of the mill as shown in his application for patent and to assist us in performing this experiment. He did not see fit to accept that invitation, and we now extend to him a second invitation to go to Depew and examine that mill that was set up and has been referred to by the witness, and observe its operation and cross examine the witness in connection with the operation of the mill.

"Mr. Stoughton: We haven't anything to say.

"Mr. Newton: Attorney for Hall and Mr. Hall refuse to accept the invitation extended to them.

"Mr. Stoughton: I haven't said a word. * * *

"Mr. Newton: This finishes the direct examination of this witness, and before cross examination the attorney and the inventor who are present are again requested to go to Depew and see this machine, at our expense, and see the machine operate.

"Mr. Stoughton: Without waiving objection and reserving all benefit thereof, I will cross examine the witness for what it is worth."

In view of the foregoing, we have no hesitation in saying that the tribunals of the Patent Office were justified in giving credit to said testimony concerning such tests.

Finally, appellant contends that the weight of the evidence is clearly contrary to the conclusion reached by the Patent Office tribunals. Appellant introduced testimony attempting to discredit the testimony upon behalf of appellee concerning the tests heretofore referred to. We have carefully examined such testimony, and find no reason to come to a conclusion different than that reached by the Examiner of Interferences and the Board of Appeals; on the contrary, a careful examination of the disclosures of the respective parties tends to corroborate the testimony upon behalf of appellee concerning the result of such tests. We are therefore unable to agree with appellant upon this contention.

We are of the opinion that the Board of Appeals committed no error in finding that appellant's original specification does not warrant claims corresponding to the counts in issue; that the process described by appellant does not produce a substantial amount of suboxide of lead as required by the counts; and that the record is insufficient to establish conception or reduction to practice of the subject-matter of the counts by appellant prior to appellee's filing date.

For the reasons stated, the decision of the Board of Appeals in this interference is affirmed.

### Interference No. 56,224.

This interference involves an application of appellant filed December 24, 1926, as a division of an application filed March 29, 1924, which earlier application was referred to in our decision in interference No. 54,798, on the one hand, and a patent, No. 1,584,152, issued to appellee on May 11, 1926, upon an application filed on April 18, 1924.

The claims in appellant's said application filed December 24, 1926, corresponding to the counts here in issue, are not found in his application of March 29, 1924, but were copied by him from the said patent to appellee, being claims 1 and 2 thereof.

The subject-matter of the issue is a paint formed of a vehicle and a powder containing a major proportion of suboxide of lead and a minor proportion of metallic lead; said powder being defined by the process employed to produce the same. The counts of the interference read as follows:

"1. A paint comprising a vehicle and a finely divided chemically reactive powder containing a major proportion of lead suboxide and a minor proportion of metallic lead, said powder resulting from the impingement of a current of air on relatively large masses of lead in a dry state, subjecting the lead to surface attrition, controlling the temperature to cause the formation of lead suboxide in the said proportions, and carrying of the powder resulting from the above by the said current of air.

"2. A paint comprising a vehicle and a finely divided chemically reactive powder containing a major proportion of lead suboxide and a minor proportion of metallic lead, said powder resulting from the impingement of a current of air on relatively large masses of lead in a dry state, subjecting the

lead to surface attrition, controlling the temperature to be not less than sixty degrees centigrade, so as to form powder containing lead suboxide in the above proportion and carrying of the powder so formed by the above mentioned current of air."

The process of producing a powder containing a major proportion of suboxide of lead and a minor proportion of metallic lead is the subject-matter of interference No. 54,-798, in which we have affirmed the decision of the Board of Appeals awarding priority of invention to appellee. Therefore the only difference between the issues in this interference and those in said interference No. 54,798 is in the added element of utilizing said powder in paint.

The Board of Appeals in its decision in this interference said:

"Since the powder involved in the two issues is the same the controversy here is merely the added limitation of utilizing it in paint. So far as appears from the record or is known as a matter of common knowledge the specific composition lead suboxide and powdered lead is a new product. Hall claims that the paint constituting the issue of this interference was made from the powder produced according to his application involved in the other interference. No other source is alleged. It follows therefore that if that record fails to prove that he prepared such powder this case falls with that.

"Reference is made to our decision in interference 54,798 concerning the merits of the proof as to the powder and process of preparing it. The record of the present interference consists mainly of a further contest as to the merits of the showing of the test at Depew concerning the process of preparing the powder and the right of Hall to allege that the disclosed process is operative to produce such powder.

Prior to the taking of any testimony in this interference, it was stipulated by the parties that the testimony taken in said interference No. 54,798 might be used in the present interference, so far as relevant and material, with a right of either party to take additional testimony. Both parties did take additional testimony, most of which, as stated by the Board, was in the nature of a further contest as to the merits of the showing of the tests conducted at Depew concerning the process of preparing the powder and upon the question of whether appellant's disclosed process is operative to produce such powder, which matters have been discussed by us in our opinion in said interference No. 54,798.

Appellant contends that, although his present application was filed subsequent to the application upon which patent was issued to appellee, he is entitled, upon the theory that his instant application is a division of his original application, to a date not later than the filing date of said original application, namely, March 29, 1924, for conception and constructive reduction to practice, and that therefore appellant is the senior party and the burden was upon appellee to establish prior conception and reduction to practice of the invention involved in the counts.

Inasmuch as we have held, in interference No. 54,798, that appellant's application of March 29, 1924, did not disclose the powder containing suboxide of lead, and that suboxide of lead is not referred to in said application, appellant is not entitled to the date of March 29, 1924, for conception and reduction to practice of the invention herein involved, and he is therefore the junior party, and the burden was upon him to establish conception and reduction to practice prior to appellee's filing date, April 18, 1924.

As heretofore observed, most of the additional testimony taken in this interference related to the merits of the showing of the tests at Depew, which tests we have discussed in our opinion in said interference No. 54,-798. In our judgment, said additional testimony does not warrant our reaching a contrary conclusion with respect to the formation of a powder containing suboxide of lead by appellant's process.

The Board of Appeals in its decision further stated: "It is found that little is said about paint in this record. The substance of the showing in that respect is that Hall very broadly states that paint was made of the powder involved in the other interference and that parts of the mill and building were painted therewith. He is corroborated by Smith, Gorrell and Kohl but only by the same very general allegations that paint was made and used. No trace of any of the painting and presumably of other exhibits could be found according to Hall's testimony. We hold that this record is not sufficient to prove the reduction to practice of paint of the issue aside from the holding that Hall has failed to prove that he has a powder conforming to the issue in this respect to its composition before Shimadzu's filing date or that he had conception of the subject matter of the issue before that date followed by diligence up to a later reduction on his filing date."

We have carefully examined the record, and are in accord with the foregoing findings

of the Board of Appeals, and the decision of the board in this interference is therefore affirmed.

For the reasons stated, the decisions of the Board of Appeals in both of the interferences herein involved are affirmed.

Affirmed.