### SHIMADZU et al. v. ELECTRIC STORAGE BATTERY CO.

No. 7727.

District Court, E. D. Pennsylvania.

Oct. 6, 1936.

See, also, 6 F.Supp. 393.

Edmund B. Whitcomb, of Toledo, Ohio, Joseph W. Henderson, of Philadelphia, Pa., George Whitefield Betts, Jr., and George Yamaoka, both of New York City, George H. Souther, of Niagara Falls, N. Y., and Carl F. Schaffer, of Toledo, Ohio, for plaintiffs.

Hugh M. Morris, of Wilmington, Del., A. B. Stoughton and E. S. W. Farnum, Jr., both of Philadelphia, Pa., and A. F. Kwis, of Cleveland, Ohio, for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity for the infringement of six patents, Nos. 1,584,149; 1,-584,150; 1,584,151; 1,584,152; 1,584,479; and 1,896,020, all of which have to do with the production of fine powder of lead by the abrasion of larger pieces of metallic lead in a dry state. Various claims of the six patents cover process, product, and apparatus. The claims in suit are 1 and 2 of 1,584,149; 1-4, 6, 8-17 of 1,584,150; 1-5 of 1,584,151; all claims of 1,584,152; 1-4 of 1,584,479; and 10 and 11 of 1,896,-020.

The product is used in the manufacture of plates for storage batteries. These plates consist. of thin grids upon which lead paste is spread. The base of the paste is the powder, to which are added certain ingredients with which we are not concerned. It has been the experience of the industry that unless the powder is exceedingly fine and uniform in texture the paste will crack, peel, or flake off from the grids when the battery is in use and thus shorten its life and impair its efficiency. The powder consists chemically of lead of which the greater part has undergone some degree of oxidation. The precise proportion in which pure lead and lead oxides appear in the mixture as well as the degree of oxidation are not important except as they affect its physical properties.

Until fifteen or twenty years ago, makers of storage batteries bought their powder. It was manufactured by various molten lead processes and consisted of finely divided litharge, red lead, or other of the higher oxides. It was far from satisfactory, lacking the requisite uniformity and fineness. The necessity of purchasing it from others added to manufacturing costs. These drawbacks combined to make the matter of obtaining the powder a major problem in the industry. It can readily be seen that the development of a process by which makers of storage batteries could, without prohibitive expense of installation, produce in their own plants and in commercial quantities a thoroughly satisfactory powder would be of immense advantage to the industry, and it is not surprising that manufacturers in various parts of the world were spending a good deal of time and effort toward this end.

### History of the Invention.

A brief account of the development of the process involved in this suit will be useful, not only in fixing the date of invention, but also as a means of getting an understanding of its nature and the importance of its various elements.

Beginning about the middle of September, 1918, the plaintiff Genzo Shimadzu, the largest manufacturer of storage batteries in Japan, and the head of many other industries, started experimenting with the idea that pieces of lead or lead balls could be abraded into powder by tumbling them together in a revolving vessel. He tried out, successively, porcelain

vessels borrowed from the pottery industry, wooden drums, with and without metallic linings, vertical grinders of the mortar type, and a large specially constructed iron drum. He made a great number of trials during September, October, and November of 1918. Most of the product obtained was too coarse and irregular to be of any use, though some small amount of "hopeful fine powder" was observed. He also tried separating the fine from the coarse after the product had left the mill, by means of an air blast—which worked well enough but left the residue of coarse powder as pure waste.

Finally in December, 1918, he hit upon the idea of directing an air blast directly into the vessel in which the lead was being abraded, and a large metal drum was constructed with an inlet for the air current and an outlet by which the fine powder could be blown out. After some experimentation the inlet was fitted with a tube extending into the drum, having nozzles so that the air could be blown directly upon the abrading masses. This apparatus was completed and first operated in March, 1919.

It was at once observed that the amount of the product increased tremendously. This was a development of the greatest importance. The mere knowledge of some process by which the right kind of powder could be produced in trifling amounts was of very little value to any one. The industry was looking for a way to make large quantities cheaply, and an invention which fell short of accomplishing that result would have been of academic interest only.

The increase in production was due to the fact that the air was an oxidizing agent, forming a brittle layer of oxidized lead upon the plastic surfaces of the balls, which easily abraded off leaving a fresh surface, upon which the process was continued until the balls were entirely pulverized.

It is possible that at that stage the plaintiff had no real appreciation of the importance of the oxidizing effect of the air current. He appears to have thought that the removal of the dust was the principal cause of the increase in production. There was some ground for this belief, since it was not unreasonable to think that as long as the dust remained in the drum it would act more or less as a lubricant for the surfaces of the balls. But certainly, with the scientific resources and expert assistance at his command, he must have known that oxidation would be accelerated by the introduction of the air current. How much more than that he knew is hard to say.

Full commercial realization of the process did not follow immediately upon the installation of the mill in Shimadzu's plant (which was in June, 1919). That came only after more experimenting. Although some mechanical improvements upon the apparatus were made, most of this work had to do with the speed of revolution of the mill and the force and volume of the air current. What was actually being worked out, whether consciously or otherwise, was a second and highly important element of the process, namely, temperature control. Production in satisfactory quantities depended upon abrading the balls to powder as rapidly as possible and that in turn depended upon determining and maintaining a temperature in the mill which would be high enough to produce rapid oxidation, but not so high as to melt the metal or to over-oxidize the product. The mill was large enough to be used commercially, and the plaintiff's witnesses referred to this period as "industrial scale experimental research." It was carried on from June, 1919, through the spring of 1920. Long before its termination, successful operation was so assured that it was decided to build a plant solely for the production of powder by the new process. The construction of the new plant was started in April, 1920, was completed in June of the same year, and went into regular operation about that time.

I fix the date of invention and successful reduction to practice as not later than August, 1919, that being the date of the "powdering machine" having the construction shown in Figure 28 of Ishimura's notebook. Whether or not the plaintiff, even then, fully realized the chemical reaction which made his process a success is beside the point. He certainly knew by that time that, subject to working out of details, he would be able to obtain large quantities of a satisfactory product. That was his major interest as well as that of the industry. A research scientist would, undoubtedly, have centered his attention upon the chemical reaction involved, but Shimadzu was a practical commercial operator, and I think it clear that he had

enough appreciation of what was necessary to obtain the desired result for me to fix the date of invention at or before the time referred to, which is all that is necessary for the purposes of this case.

The process was unquestionably invented when the idea of blowing an air blast into a rotating mill in which lead pieces were being abraded and keeping the whole at a controlled high temperature by means of regulating speed of revolution and air pressure had been evolved and successfully practiced, and this point had been reached well with the time fixed.

The Process Claims of the Patents, Particularly '150.

At this point it will be convenient to summarize the process claims of the American patents postponing discussion of the product claims until later.

The important patent is 1,584,150. Some of the process claims of this patent define the thing which the process produces as "a fine powder of lead suboxide intermingled with powdered metallic lead" (claims 1, 2, 3, 4, 6, and 8). The remainder define it as a finely divided powder containing a large proportion of oxidized lead without any mention of lead suboxide (claims 9, 10, 11, 12, and 13). Claim 7 is not in suit. Passing over the first group ("suboxide" process claims) for the present, claim 9 is typical of the second group. It calls for the following steps:

(1) Impinging a current of air on lead masses in a dry state; (2) abrading the lead masses; (3) controlling the temperature to obtain a finely divided powder containing a large proportion of oxidized lead.

Claims 10 and 13 fix the necessary temperature at above 60 degrees centigrade.

Claim 2 of '149 is another process claim of this type, referring to "a finely divided chemically reactive lead powder of such fineness and activity as to be readily changed chemically on exposure to air." The air current is introduced into the vessel for the purpose of removing the powder formed by attrition of the lead masses. This patent contains no suggestion of the oxidizing effect of the air, or of temperature control.

The '151 patent carries on the process of '150, and deals with the further oxidation of its product to form higher oxides such as litharge and red lead. This patent really belongs with the product claims, since its process begins with a lead sub-

oxide powder. It stands or falls with the product claims of '150.

'152 has to do with paint and depends on the product claims of '150 rather than the process.

'479 relates to the preparation of the plates for storage batteries, mixing the product obtained by the earlier patents with various liquids.

The '020 patent is for the apparatus.

In all the process claims of '150 in suit the essence of the invention claimed is accelerated abrasion by oxidation of lead surfaces by air blast and regulated temperature.

The Japanese Patents.

In November of 1920, the plaintiff applied in Japan for a patent which was later issued to him as patent No. 42,563. Both before and after that time he also applied for other Japanese patents, but '563 is the only one which need be considered in this connection. The application date was more than a year before the plaintiff filed his application for U. S. '150 or, for that matter, for any of his American patents, and therefore R.S. § 4887 (35 U.S.C.A. § 32) would invalidate the American patents if the latter are for the same invention.

The law, as laid down by the Circuit Court of Appeals for the Third Circuit in Altoona Publix Theatres v. American Tri-Ergon Corporation, 72 F.(2d) 53, 59, is that where the defense is in invalidity under R.S. § 4887 (35 U.S.C.A. § 32), the question is not what was disclosed, but what was claimed in the earlier patent. The language of the statute makes it clear that it is the patenting of the invention which is material, and it is the claim, not the disclosure of the specification, which determines what has been patented. In the opinion referred to, the court said, "There are many features disclosed in the German patent which are not claimed, and in law the patent stands as though the features were not disclosed." The foreign patents and the American must be identical (Leeds & Catlin Co. v. Victor Talking Machine Company, 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805) and a heavy burden of proof rests upon the defendant to show that they are (General Electric Company v. Alexander [C.C.A.] 280 F. 852).

Claim 1 of the Japanese patent, No. 42,563, is as follows:

"In order to achieve the object recorded earlier in this record, a method of manufacturing chemically reactive lead powder is claimed, a special feature of which is throwing lumps of lead into a rotating vessel, and blowing currents of air or other inactive gases into the vessel during rotation to force the small particles produced by rubbing out of the vessel."

The other claims are like enough to the first to require no separate discussion.

Is this a claim for the invention patented in U. S. '150? I do not think that it is, and when the whole disclosure of the Japanese patent is read carefully that conclusion is fortified. The first thing that strikes one is that there is not the slightest suggestion of any oxidizing effect of the current of gas which is introduced into the mill. On the contrary, it would seem that there was a definite purpose to avoid oxidation. The patent has to do with the purely mechanical step of removing the lead powder from the rotating vessel. It almost looks as though the patentee feared that, in the course of removal, oxidation would take place and provided, according to his lights, against it. For example, he points out that powder produced by the process of an earlier patent (which provided no means for its removal) is likely to ignite spontaneously, due to the heat of friction inside the mill. "But this defect" he says "is * * * eliminated by the present invention, by blowing in air or some other inactive gas with a resultant cooling effect." Obviously, the teaching of the patent is that the mill should be operated at as low a temperature as possible.

The cooling and conveying medium is described in all the claims as "air or other inactive gases." This is a flat contradiction in terms. An inactive gas is one which has no oxidizing effect on other substances. Air, containing about 21 per cent. oxygen, is an active gas. It is certainly an extraordinary thing that the plaintiff should have been unaware of this but, nevertheless, the use of the word "other," read in the light of the object of the patent as disclosed in the entire specification, leaves no doubt that he mentioned air as an example of a convenient inactive gas. The best guess that one can make of what he had in mind was that he meant to patent a process for mechanically removing fine powder from the drum by means of a current of some nonoxidizing medium, and that he believed that air with its high percentage (78 per cent.) of nitrogen, if delivered at a low temperature, would be sufficiently inert to serve his purpose and prevent combustion within the drum. It is scarcely necessary to point out how completely this misses the invention described in the American patent, which depends primarily upon the initial and continuous rapid oxidation of the surfaces of the metallic lead, accomplished by the air blast, the regulation of the heat and of the amount of oxidizing gas all being directed to obtain this reaction to the maximum effective degree.

Besides this, if the Japanese patent has been correctly interpreted as a disclosure of the use of a nonoxidizing medium, it is invalid, regardless of what it attempts to claim, because the process is perfectly useless and inoperative. It was demonstrated conclusively both by witnesses at this trial and by Ishimura in the course of his efforts to develop the process that, if lead balls are rumbled together in an inert atmosphere, the result will be nil. The balls will simply polish one another and not an ounce of powder will result.

.But the defendant argues that, even if the claims do not cover the American patent and R.S. § 4887 (35 U.S.C.A. § 32) does not apply, the unclaimed disclosure of the use of an air blast upon the abrading lead masses was dedicated to the public or anticipates as a foreign publication. In order to get even a starting point for this argument it is necessary to omit the word "other" wherever it occurs in the phrase "air or other inactive gas." If this is done (and I do not see how it can be), the best case that can be made out for the defendant's theory is that the disclosure suggests two inconsistent and mutually exclusive methods, one of which may lead to a useful result if understood and further developed by temperature control, and the other of which leads to nothing. A disclosure of this kind cannot operate either as an anticipation or as a dedication of anything to the public. A patent, like any other instrument, may be of doubtful meaning or it may contain several meanings applicable to varying conditions, but it cannot have two meanings

inconsistent with each other. See Kintner v. Atlantic Communication Company (C. C.A.) 240 F. 716, 720. "A document so obscure in its terminology that two conflicting theories may be deduced therefrom and supported by equally plausible arguments is too indefinite to be utilized as an anticipation." Cimiotti Unhairing Company v. Comstock Unhairing Company (C.C.) 115 F. 524.

If this patent (amended to suit the defendant's argument by striking out the word "other") were placed in the hands of a person skilled in the art, with instructions to inaugurate the process, he could but guess as to which method to use. As a matter of fact, he would be more than likely to confine himself to nitrogen or some inert gas, because the patent seems to imply that an active gas might be detrimental; and he might spend an indefinite period of experimentation and even have to exercise truly inventive qualities before he ever reached the point of using an oxidizing medium.

But the foregoing discussion is perhaps unnecessary. The patent cannot be read as a disclosure of alternative processes. It must be interpreted with a certain amount of common sense and regard for its plain objects. The last thing it intended to teach was the use of an oxidizing agent. When air was referred to, it was as an example of a nonoxidizing gas, and to say that this incidental and erroneous use of it amounts to a disclosure or dedication of something which the patent obviously meant to steer clear of is going very far out of the way to destroy the American patent.

For whatever it may be worth, it is pretty clear that the plaintiff himself did not understand that, when he applied for Japanese '563, he was taking out a patent on the same process which appears in U. S. '150, because subsequently, in Japan, he took another patent, No. 60,825, which corresponds very closely with U. S. '150, and, being within the year, does not invalidate it. We are not concerned with the motives which prompted him, in taking out the '563 patent, to confine it to the single step of mechanical removal of the dust from the drum, and to withhold the really essential steps of the invention for later patenting. It is sufficient to say that he had the right to do this if he chose.

### Alleged Prior Public Use.

The activities of the defendant and the Tudor mill.

Since about 1900, the defendant has been engaged in manufacturing storage batteries in the United States. It originally bought its lead powder and was having the same difficulties keeping up the quality of its battery plates and in reducing production costs as the plaintiff found in Japan. Like the plaintiff, it was looking about for some way of manufacturing its own lead powder and improving it in order to meet the exacting requirements of its trade. At an early date it had imported some red dust from A. F. A., a large storage battery manufacturer in Germany, with whom it had an arrangement for exchange of technical and engineering information.

In 1907 one of the defendant's engineers observed the operation of an apparatus known as a Tudor mill in the German plant, and brought back a report about it. In 1912 he again visited and again reported. Finally, in July, 1915, the defendant bought a Tudor mill duplicating those seen by their engineer in Germany and set it up in its plant, putting it into operation about the middle of 1916. The engineer who had been in Germany turned over to the official in charge of the mill all the information which he had obtained about it. Various runs were made for the purpose of obtaining a product and in 1917 and 1918 batteries constructed from the powder were sold to New York Railways Company. The first order was for 70 sets of batteries at a price of $65,000 comprising some 16,000 plates. A second order was for about a fifth of that amount.

About the middle of 1918, however, the mill was dismantled (the plaintiff says "junked") and sent out to the Willard Storage Battery Company in Cleveland— a concern controlled by the defendant. It was not operated at the Willard plant until May, 1920, but shortly after that date some runs were made and a comparatively small quantity of lead powder was produced which was used in regular production of plates. Then the mill was dismantled again and shipped back to the defendant in Philadelphia where it was stored until it was finally disposed of as scrap metal.

While it is true that the orders of the New York Railways Company were not

repeated and that the commercial production at the Willard Company was unimportant, and while there was undoubtedly a great deal of experimental work being done with the mill all through these operations, I cannot agree with the plaintiff that the whole incident must be dismissed as an abandoned experiment. Certainly it was not a great success, as can be seen from the bare recital of the facts about it. There is nothing to indicate that the product was not satisfactory, but the mill never produced powder in sufficient quantity to justify its continuation in commercial use. Nevertheless, I think it might stand as a prior public use against the plaintiff's patents, provided it really anticipated the plaintiff's invention—a question which will be considered later.

In July, 1920, the defendant set about installing a full-sized plant for the manufacture of lead powder at Philadelphia. Mr. Hall was engaged for that purpose. No powder had been produced at the Philadelphia plant since 1918. Hall had complete plans of the German Tudor mill, together with engineer's reports and notes and the records of its operation in Philadelphia, but attempted no further development along that line. Instead, he decided upon what he referred to as a "radical change" from the German mill. As a matter of fact, he discarded it altogether and proceeded to install an entirely different type, which embodied the plaintiff's principles and in which the principal element was a Hardinge conical mill. He "recognized that means must be provided for admitting air into the interior of the mill" and proceeded to do so. He also, by this time, understood that temperature control was an important part of the process if quantity production was to be obtained. The defendant's engineer testified: "As the mechanical equipment of this installation was perfected, it developed that a Hardinge mill made possible a very wide and different control of product. The primary element entering into the control proved to be: Amount of air admitted to mill. Temperature of the interior of the mill. Lead within the mill. * * * It became evident at once the Hardinge mill was started that a different flow of air through the mill must be provided. * * *" To "standardize" the quality a great deal of experimenting by the research department was required, which continued after the mill was set up.

Referring to the date of June, 1921, the witness testified, "As the main principles of operation were now understood. * * *" The mill was installed early in 1921 and was not in commercial production until some time after April 22d of that year.

In 1923 the present plant was erected and four Hardinge mills installed and in July of that year large-scale commercial production continued. Commercial production by the Hardinge mill with its forced air draft undoubtedly involved the use of the plaintiff's patent, and June, 1921, may be fixed as the date when that began.

To return to the Tudor mill. Regardless of the lack of commercial success with this, I am of the opinion that it cannot be considered as a prior public use against the patents in suit, because its entire operation failed even to approximate the essential idea of the plaintiff's process patent. If it is a mere question of a literal reading of the patent, it may be possible to find in the Tudor mill process the bare elements of the plaintiff's patent, but if the method of operation be carefully considered, it will be seen how far away from the spirit it is. The essence of the plaintiff's patent, as has been already seen, is forcing a continuous blast of air into the drum at a controlled high temperature so that oxygen will be absorbed by the lead and form a brittle oxidized surface which could be rapidly abraded off. Now, in the Tudor mill, the whole surface of the drum was perforated with a great number of eighth-inch holes. The drum was surrounded by a fine mesh cylindrical screen and this in turn by an outside iron casing. A certain amount of air, of course, got into the drum through the casing, and a moderate draft was established, apparently to prevent it getting too hot, by putting a stack at the top of the casing and a small vent pipe with a damper at the bottom. That was all. There was absolutely no suggestion or thought of blowing or forcing the air into the drum. As a matter of fact, the broken and powdered material lying against the perforations in it must have kept a great deal of the circulating air out. The defendant never had the slightest conception of the effect which even this gentle circulation of air had upon the lead surfaces to be abraded. The correlation between oxidation in the drum and increased yield

was not perceived. Its engineer considered that the only really important oxidation that took place in the lead powder was after it left the drum and as it descended by gravity in the casing into the kegs to be filled. Naturally, there was no thought of temperature control to get the maximum degree of oxidation in the drum. The results were about what would be expected. The amount of product obtained was very limited and the mill simply did not solve the problem or meet the requirements of a commercially useful process. It was abandoned.

Both the plaintiff and the defendant had been confronted by the same industrial difficulties. Both were groping for a way of overcoming them and both reached a satisfactory result. There is no evidence—nothing more than a suspicion —that the defendant's abandonment of the Tudor mill and its adoption of the process of the plaintiff was caused by anything learned at the plaintiff's mill in Japan. It does not detract from the quality of the invention that it was reached independently by another in a distant part of the world. On the contrary, the fact that different streams of inventive effort had for years been directed toward the same end goes to show the importance of a successful outcome to the industry.

### The Hall-Shimadzu Interference.

In 1924 Mr. Hall filed an application covering the process which had been developed in the defendant's plant. The plaintiff's applications for his American patents had been filed during the years 1922–1924. While the Hall application was pending, Shimadzu's patent '150 issued. Hall believed the processes of the two applications to be identical, added claims 2, 3, 4, 6, 14, 15, 16, and 17 of Shimadzu to his application, and interference was declared. The law examiner held that claims 9 to 13 of Shimadzu (process claims not referring to lead suboxide) were unpatentable. As to the other claims, the Board of Appeals for the Patent Office awarded priority to Shimadzu, and this decision was affirmed by the Court of Customs and Patent Appeals. Hall v. Shimadzu, 59 F.(2d) 225.

I do not think that this phase of the case deserves quite the importance which the parties have given it, or that it is necessary to go in detail into the testimony before the tribunals of the Patent Office, or into the reasons for its decision stated by the Court of Customs and Patent Appeals. The sole issue determined, and the only point as to which those proceedings are res judicata, is that, whatever Hall may have done, he had not made the invention of Shimadzu's '150 patent prior to the time when Shimadzu made it. Upon this issue the burden lay upon Hall to establish that he was the prior inventor, and this burden the court held that he did did not sustain. It was the only question which the tribunals of the Patent Office had jurisdiction to decide. The interference proceeding and this infringement suit are not based upon the same cause of action, and in such case the law is well settled that only those questions actually decided in an earlier suit are res judicata in a later one. Troxell v. Delaware, Lackawanna & Western Railroad Company, 227 U.S. 434, 33 S.Ct. 274, 57 L.Ed. 586.

The record in the interference was relevant only as it affected the value of the testimony given by the witnesses who testified in both cases. In the earlier proceeding Hall had asserted that his process was capable of producing, and did produce, the product of Shimadzu's '150. Ishimura, who had not seen it in operation, but who had painstakingly set up a duplicate mill, had testified that it could not possibly do so. Both witnesses, when called in the present case, were compelled to explain a number of embarrassing inconsistencies—an ordeal which, I think, both went through as gracefully as possible under the circumstances. Otherwise, the interference proceedings do not require extended consideration.

### Prior Art Patents.

The defendant has cited a number of prior patents against the patents in suit, with particular reference to '149 and '150.

The plaintiff is undoubtedly entitled to rely for priority upon the date of invention and reduction to practice as found, regardless of the fact that the invention was made in a foreign country. Claude Neon Lights, Inc., v. Rainbow Light, Inc. (D.C.) 47 F.(2d) 345; Hanifen v. E. H. Godshalk Company (C.C.) 78 F. 811. This eliminates from consideration the Belgian Tudor patent, No. 239,406, Thibault French patent, No. 494,270 of September 4, 1919, and one of two others. Of those remaining, only Bailey U. S. patent, No. 846,384, requires extended consideration.

The Thibault patent, supra, will, however, be discussed because its date is so very close to the date of invention.

As to these patents, as well as all the others cited by the defendant, the general observation may be made that in a great industry, with unlimited capital and expert knowledge of the highest type at its command, endeavoring for many years to reach a solution of a serious problem, they made not the slightest impression. To draw the conclusion from this that they were wholly inoperative would be perhaps going too far. But, whatever the reason, it can be safely said that they somehow missed the mark—a fact which must be borne in mind when their disclosures are considered as prior art.

In Bailey's patent, a cylinder is equipped with mechanical beaters or paddles and into it is fed lead already in a rather fine state of division. It is stated in the specification that molten metal may be first blown by air or steam to a suitable degree of fineness. The device is clearly intended to begin its operation upon lead already in the form of a powder. Certainly the exemplification of the apparatus given in the specification would not work upon any other type of material. The beaters reduce the coarse powder to a finer state and a current of air is used to remove the fine product after it is produced. No doubt oxidation takes place in the course of the procedure, and the final product may well be very similar to that of the plaintiff's patent.

But there is no suggestion whatever of the oxidation of the lead masses to produce a large quantity of product by their rapid and complete abrasion acting upon themselves, and without other mechanical means. Bailey's final product is only in a very remote degree the product of abrasion. True, he throws in the suggestion that " * * * It is possible that the product may be produced in many ways, as by a grinding or abrading process," but this casual reference is too indefinite to amount to an effective disclosure. It may, and probably does, mean preparing the metallic lead for the mill by the use of grinding stones, filing machines, or other abrasive devices. If it is intended as an alternative to the entire process, then it contains no suggestion of the air blast. At all events, it is entirely too indefinite to amount to an anticipatory disclosure of the vital principle on which the plaintiff's process is based. From the fact that the air is introduced halfway up the cylinder, and sucked out at the top, it looks as though Bailey felt it undesirable that the air should do anything other than carry out the fine dust. The abrasion which would take place among the grains of coarse powder as they were agitated by the beaters would be entirely negligible in obtaining the quantity production which is, after all, the object of all these processes.

Thibault puts his material into a cylindrical vessel and simply cooks it—an operation which he assists by blowing compressed air and steam into the vessel, which might well be called a kiln. It is a closed vessel and the combined steam and air pressure is regulated by a needle valve. Again, the material preferred is lead in granulated form, which suggests preliminary treatment of some kind to reduce it to a suitable degree of fineness. Some fine particles escape through the valves and are collected, but the bulk of his final product is what remains in the vessel after the process of oxidation is completed.

The vessel may be, but does not have to be rotatable. It would not be too much to say that Thibault not only fails to utilize abrasion of the oxidized masses in order to get a mixture of lead and an oxide of lead but rather definitely excludes it. The complete oxidation of his material was the thing that he was primarily trying to obtain. Any metallic lead in the final product was plainly an undesirable by-product. As in Bailey, the basic principle of the plaintiff's patents is ignored. Finally (a matter of immense practical importance) the process cannot be carried on continuously, since at the end of a seven or eight-hour period, the entire charge of metallic lead has been converted into oxide, and the mill must be stopped and cooled and the charge removed before it can be reloaded. This fact alone, necessarily reducing the production to a small fraction of that which can be obtained from the plaintiff's process, would put the device out of the field as an anticipation of the plaintiff, and possibly accounts for its failure to make any impression.

### The Product Claims.

Claims 14, 15, 16, and 17 of '150, and claims 1 and 2 of '152 are for the product. They all describe the powder as com-

posed in part of lead suboxide. Claim 17 of '150 may be taken as typical. It is:

"As a new composition of matter, a highly chemically reactive powder, comprising a large portion of lead suboxide, said powder being capable of spontaneous reaction on contact with air."

With regard to these claims the defendant's position is that lead suboxide is a purely hypothetical substance which has no actual existence, and that, therefore, the claims are invalid or, if valid, are not susceptible of being infringed.

Lead suboxide, according to the plaintiff's theory, is a chemical combination, the molecular structure of which is two atoms of lead combined with one of oxygen. Its symbol is $Pb_2O$.

Quite a number of higher oxides of lead have been identified, and are now well known to science. The existence of $Pb_2O$, however, is not, at the present time, accepted as a scientific fact. There are eminent authorities who affirm it, and others, equally worthy of acceptance, who deny it. The entire matter may be said to lie in the realm of controversy.

The plaintiff concedes that the substance is of a fugitive character, rapidly transformed into a higher oxide in the atmosphere, difficult to segregate, and not susceptible of identification by any ordinary method of chemical analysis. Within the last quarter century, however, there has been developed a method of analysis by use of the X-ray grounded upon the basic crystalline structure of certain substances, various forms of crystals being represented by certain arrangements of imaginary points and lines known as space lattices and the structure of the substance under examination being identified by referring its X-ray spectrum or diffraction pattern to calculated patterns of the space lattices. Using this method as his principal support, the plaintiff's expert testified to the existence of the lead suboxide as a chemical compound, and to its presence in the product of the defendant's mill. Using the same method, the defendant's experts reached a diametrically opposite conclusion.

Upon this issue thus presented, a very large amount of extraordinarily interesting testimony was taken. I shall not attempt to do more than briefly comment upon it, and state my conclusion.

Berzelius, about a century ago, prepared a black powder containing lead by igniting lead oxalate in a vacuum. This product was highly reactive and took fire spontaneously in the air. Having analyzed it, he gave it the name "lead suboxide," owing to the fact that it contained less oxygen than lead monoxide, commonly known as litharge. For almost a century this substance has been described in textbooks and handbooks as lead suboxide. However, rather recently its existence came to be regarded with a certain amount of skepticism, a few chemists believing it to be merely a mixture of finely divided lead and lead monoxide.

I believe that the plaintiff concedes that the experiments of Berzelius could not have produced lead suboxide, in the proportion in which Berzelius believed that he found it, and, if at all, only in very minute quantities.

In 1926, Ferrari published the results of an X-ray examination of a sample of so-called lead suboxide of Berzelius. He claimed to have found lines in the X-ray spectrum of this substance which indicated the presence of $Pb_2O$. Subsequently, at least two other scientists repeated Ferrari's work and were unable to duplicate his results. Consequently, they drew the conclusion that Ferrari's original data were in error and that there was no evidence for the existence of lead suboxide in the black powder of Berzelius. Despite these publications questioning the validity of Ferrari's experimental work, there has come from his laboratory no additional paper containing evidence in confirmation of his original data.

Dr. Davey and Dr. Anderson, the experts for the defendant, both well-known workers in this particular field, have examined by the X-ray method of analysis samples of the defendant's product and have been unable to find any evidence for the existence of suboxide in either it or in samples of black oxide prepared according to the directions of Berzelius.

Dr. Clark, the plaintiff's expert in this case, an outstanding authority upon laboratory technique, examined similar samples of the defendant's product and of the black oxide of Berzelius and testified that he found some lines which correspond very closely with Ferrari's pattern. He also by means of a supercentrifuge separated from the defendant's product some very finely divided material which

he claimed to be nearly pure lead suboxide. In substantiation of this he made a chemical analysis of the product and states that the percentage of lead corresponds fairly well with that required by the formula of lead suboxide, $Pb_2O$.

Against these conclusions, it was pointed out by Dr. Davey with much force that, inasmuch as pure $Pb_2O$ has never been segregated, there is no existing X-ray pattern for it and that, consequently, the conclusions of Dr. Clark are only warranted if the calculated or hypothetical lattice for $Pb_2O$ is actually the correct one. It is also true that the percentage of lead, as reported by Dr. Clark from his chemical analysis, while it happens to correspond to the theoretical demand of $Pb_2O$, does not by any means prove that $Pb_2O$ is actually present, since the same percentage might be given by a mixture of lead and lead monoxide.

Without questioning either the accuracy of Dr. Clark's experimental data or the sincerity of his rather guarded conclusion, or that of the much more positive opinions of the defendant's experts, my verdict must be "not proven" as to either the existence or nonexistence of the questioned substance. Such a verdict is, I believe, in accordance with the general position of scientific thought upon the question today. It would be little short of absurd for me to make a definite fact finding in a field in which science itself has arrived at no generally accepted conclusion, and I shall not attempt to do so.

This recalls us to the fact that we are engaged in the determination of a dispute between two parties in a court of law, rather than in an excursion into the realm of scientific research, and we must approach the question from the standpoint of the rules which the law has established for resolving the controverted issue. The patent is by reason of its issue presumptively valid and the burden of proof is upon the defendant to show its invalidity. I am unable to find as a fact that lead suboxide does not exist. The burden has not been met, and the product claims are therefore held valid.

On the other hand, the burden is upon the plaintiff to prove infringement. He has not established the fact that suboxide is to be found in the defendant's product and so has failed to meet the burden. I therefore hold that the claims above referred to are not infringed.

### The "Suboxide" Process Claims.

These are claims for the process, in which the product is incidentally described as containing lead suboxide. They are claims 1, 2, 3, 4, 5, 6, and 8 of '150, claim 1 of '149, the seven claims of '151, and the four claims of '479. The considerations which apply to them are quite different from those which I have stated in connection with the product claims.

In these claims what was primarily intended to be covered was a method of producing in commercially useful quantities a lead powder of such fineness and uniformity as to make it satisfactory for battery plates.

Undoubtedly, the adoption of the term, lead suboxide, by the plaintiff to describe one of the constituents of his product was due to the fact that under certain conditions it was of low oxidation and almost black in color. Any one in his position in, let us say 1920, consulting a standard chemical dictionary would probably feel justified in drawing the conclusion that he had in his product a large proportion of this black oxide of Berzelius. At least he would find numerous statements in text-books justifying his use of that term. It might be pointed out in this connection that X-ray analysis was not applied to an examination of the black oxide of Berzelius until eight years after Shimadzu undertook his first experiments.

Now it is well established that even in product claims an inventor is entitled to considerable latitude in his definitions, and may to a large extent define the product in his own terms. A fortiori, where the invention is for a process for obtaining a commercial product in which the physical rather than the chemical qualities are the important thing, he will not invalidate his patent because in naming the product he has adopted a term, well recognized by the scientific world, which later turns out to be of doubtful accuracy. The patent law is not concerned with abstract scientific principles, but with the means of usefully employing processes, apparatus, etc., which may result therefrom. As observed by Mr. Justice Holmes in Minerals Separation Corporation v. Magma Company, 280 U.S. 400, 403, 50 S.Ct. 185, 186, 74 L.Ed. 511, "No one concerned in this business would care a straw as to the intimate nature of the action if it produced the result."

From what has been said, it follows that, as to these process claims, infringement may be found if the process covered is used by the defendant, even though it is impossible to prove that the product manufactured by the defendant contained lead suboxide. Where the product claims are the only things in issue, suboxide is necessary to their validity over the prior art, since small quantities of a powder having generally similar physical characteristics had undoubtedly been produced before, and consequently infringement cannot be found without proof that lead suboxide exists in the accused mixture. But where the question is the use of a commercial process to obtain a product in quantity and the description of the product is more or less incidental, it would be more than unfair to deny the inventor the rights to which he would be otherwise entitled because of a misdescription.

What has been said may be taken as applying to the suboxide process claims of '149 and '150. The five claims in suit of '151 and the four claims of '479 are process claims, but they stand upon a slightly different basis. They begin with the product of '150 and treat it in order to produce something different. In every case this initial product or element of the process is described as being or containing lead suboxide. Now, as has been held, it will not necessarily invalidate a process that its final product is given a name which is scientifically incorrect. But in these claims the use of the described powder is the first and vital step of the process. It is the suboxide constituent which gives them novelty over the prior art. Therefore they really stand with the product claims—presumptively valid, but in the present state of scientific knowledge not susceptible of proof of infringement.

Patent '149 and Double Patenting.

Patent '149 claims a process for the formation of lead powder by abrasion of masses in a rotating vessel plus "removing said powder from said vessel by means of" a current of air (claim 2). This patent is not invalidated by Japanese patent '563 for reasons already given in connection with that patent. The erroneous use in the Japanese patent of air as an example of an inert gas is not sufficient to make it identical with a patent which claims the use of air and nothing else.

Whether or not '149 is for the same process as U. S. patent '150 is immaterial, so far as the question of validity of either is concerned. There is no double patenting involved. The two patents issued on the same day. They both expire on the same day. There can be no extension of the monopoly and one is not prior art against the other.

The fact that '149 does not disclose the oxidizing function of the air or refer to the highly important element of the process having to do with the temperature control necessary to its successful operation might throw doubt upon its validity in view of the prior art. This is, of course, upon the assumption that it is not for the same invention as '150. The whole matter, however, is rather academic since '149 is coincident in duration with '150, and the defendant's process infringes the somewhat more precise, if not narrower, claims of '150.

This patent is therefore held valid and infringed.

### Infringement of Process.

There can be no question that the process used by the defendant is substantially the same as that of the plaintiff's patents. In fact it is almost identical. As a fact finding upon this point, the report of Dr. Wilson, an independent expert appointed by the court who made a complete study of the defendant's operation at the Crescentville plant, is adopted by reference.

### Apparatus.

The apparatus patent ('020) is closely related, of course, to the process patents. Practically all the considerations which apply to the one apply to the other, including the Tudor mill and other alleged prior art structures. Having held the process claims valid and infringed, the same conclusion is reached with regard to the apparatus patent.

### Conclusions.

Claims 1 and 2 of patent 1,584,149 are valid and infringed.

Claims 1, 2, 3, 4, 6, 8, 9, 10, 11, 12, and 13 of patent 1,584,150 are valid and infringed.

Claims 14, 15, 16, and 17 of 1,584,-150 are valid but not infringed.

Claims 1, 2, 3, 4, and 5 of 1,584,-151 are valid but not infringed.

Claims 1 and 2 of patent 1,584,152 are valid but not infringed.

■ Claims 1, 2, 3, and 4 of 1,584,479 are valid but not infringed.

■ Claims 10 and 11 of patent 1,896,020 are valid and infringed.

The statements of fact contained in the foregoing opinion may be taken as special findings of fact and the statements of law may be taken as conclusions of law under rule 70½ (28 U.S.C.A. following section 723).

Decree may be submitted.