## SHIMADZU et al. v. ELECTRIC STORAGE BATTERY CO.

### No. 7727.

District Court, E. D. Pennsylvania.

Oct. 8, 1940.

Braselton, Whitcomb & Davies, Edmund B. Whitcomb, and George H. Souther, all of Toledo, Ohio, Hunt, Hill & Betts, Geo. Whitefield Betts, Jr., and George Yamaoka, all of New York City, and Rawle & Henderson and Joseph W. Henderson, all of Philadelphia, Pa., for plaintiff.

Augustus B. Stoughton, of Philadelphia, Pa., Hugh M. Morris, of Wilmington, Del., A. F. Kwis, of Cleveland, Ohio, and E.

S. W. Farnum, Jr., of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This case at first involved the validity and infringement of a group of six patents having to do with the production of lead powder for use in making storage battery plates. They will be referred to by their abbreviated numbers. We are now directly concerned with the validity and infringement of one of them (1,548,149) and, incidentally, with the scope of another (1,-548,150). These two patents issued on the same day, May 11, 1926. '150 was the more explicit of the two and included a statement of what the patentee believed to be the underlying scientific principle of the invention.

This court held certain claims of '150 valid and infringed. 17 F.Supp. 42. '149 was also held valid and infringed, but was dealt with very briefly, for the reason that, '150, being the narrower patent, if it was infringed, '149 would also be infringed, and hence it made little practical difference to the parties whether '149 was valid or not. The opinion of this court will have to be read in full and what was said in it need not be repeated here.

This court's decree was affirmed by the Circuit Court of Appeals, 3 Cir., 98 F.2d 831, upon a per curiam opinion, but the Supreme Court, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071, reversed as to '150, holding it invalid because of evidence of a prior public use in this country more than two years before its application date. The Supreme Court directed this court to dismiss the bill as to '150. As to '149, the mandate was "to proceed, in the light of the dismissal as to those patents (1,896,020 was also included, but is unimportant in this connection), to determine whether U. S. Betters Patent 1,584,149 is valid and infringed." Hearing, in accordance with the mandate, has been had.[1]

Both sides agree that, if '149 is for a patentable process, it is substantially the process disclosed by '150. Claim 2 of '149 is as follows: "A method of forming a finely divided chemically reactive lead powder of such fineness and activity as to be readily changed chemically on exposure to air, which comprises introducing relatively large masses of lead into a rotatable vessel, rotating said vessel at a relatively low speed, introducing a current of air into said vessel, forming said lead powder by attrition of said lead masses resulting from the rubbing of said lead masses against each other, and removing the said powder from said vessel by means of said current of air." Claim 2 may be taken as typical of the process claims of '150. It is as follows: "A process of manufacturing a fine powder of lead suboxide intermingled with powder of metallic lead, comprising in putting in a rotatable vessel pieces of metallic lead in a dry state, introducing into the said vessel while rotating blasts of a gas containing oxygen, such as air, causing such blast to blow the powder produced out of the vessel." Other claims of '150 specify certain temperatures, putting the range between 60 degrees C. and about 200 degrees C.

The fact that '149 issued on the same day as the anticipated and hence invalid '150 does not affect the validity of the former. It may be assumed that the Supreme Court would not have sent the matter back for re-examination had the court not been satisfied on that point at least.

A review of the development of the process by the patentee is to be found in the first opinion of this court. The experimental period covered nearly a year. Rumbling pieces of lead in a rotary mill was found to produce some fine powder, in an early stage. Then an air blast was introduced, originally to separate the fine powder from the coarse. This idea came as a result of finding that some fine powder had accumulated on one of the bearings. As soon as the air blast was arranged to work satisfactorily, it was found not only that the fine powder was separated and carried out but—a much more important matter—that there was a tremendous increase in the quantity of it produced. This discovery came in the spring of 1919. The increase in quantity made the difference between success and failure, as pointed out in the first opinion.

[1] NOTE: In dealing with the prior public use against the '150 patent, I erroneously assumed—had I said so in the opinion the present proceedings might not have been necessary—that '150 had been applied for on the same day as '149, as well as issuing on the same day. As a matter of fact, it had been applied for more than a year later. Thus, the prior public use proved, which did not affect '149, invalidated '150. This was the only reason given by the Supreme Court for holding '150 invalid.

The scientific principle which made the process operate successfully was that an air blast impinging on lead balls and combining with the heat generated by friction will rapidly oxidize their surfaces. This is the reason why the surfaces become brittle enough to be readily abraded and the reason why the right kind of powder could be produced in sufficient quantities to make the process commercially useful.

The scientific principle which underlies a process is, of course, not the invention, and it need not be disclosed or even understood by the inventor of the process. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 436, 31 S.Ct. 444, 55 L.Ed. 527; Driven Well Cases (Eames v. Andrews), 122 U.S. 40, 55, 56, 7 S.Ct. 1073, 30 L.Ed. 1064. The process consists of the series of acts one performs in order to get a desired result. Combining these steps constitutes the invention.

The process (as distinguished from the principle) of claim 2 of the '149 patent is (1) putting pieces of lead into a rotatable vessel, (2) rotating the vessel at a low speed, (3) forcing an air blast into and through the vessel, (4) permitting the lead masses to be reduced to powder by surface attrition, and (5) carrying the powder out of the vessel with the air.

The question is simply whether this process, with such development of practice as ordinary operating skill would normally add to it, will produce the kind of powder which the industry had been demanding, and produce it in sufficient quantities to make the process commercially useful. If so, the same reasons which led me to conclude that '150 disclosed an important invention would apply, and, since the defendant's prior use does not affect this patent, it would be valid.

It is interesting to compare claim 2 of '149 with claim 2 of '150 (held valid and infringed by this court). The only substantial difference is that, in the latter, the final product is described as containing lead suboxide. This will be discussed later on, but the point here is that it has nothing to do with the steps of the process. It would be hard to argue that, so far as these claims are concerned, they do not disclose the same steps and the same process. To put it in the converse, I do not believe that an operator, using the process of '149 faithfully and with reasonable skill, could avoid getting commercially available quantities of lead powder of the desired quality—the result of '150.

The defendant's main argument against the validity of '149 is that the specification forbids oxidation of the balls in the drum and hence entirely misses that which was the turning point in the inventor's development of the process and which proved to be the essence of the invention.

If there were nothing but the claim, it could not well be contended that oxidation of the lead balls is not inherent in it. Even an unskilled layman knows that heat will be generated when a mass of lead balls is rumbled in a drum and that oxidation follows heat. Everyone who has blown a fire to kindle it knows that oxidation is increased by a current of air.

The controversy really centers about a portion of the specification which states that lead "easily oxidizes and spontaneously ignites, so that it is necessary to provide with a cooling apparatus to radiate the heat generated by friction, when treating easily oxidizable metals, such as lead." The defendant contends that is a direction to eliminate all oxidation and that the patent is therefore no advance over the earlier 42,563 Japanese patent which plainly contemplated nothing more than the removal of the powder, and which did entirely prevent oxidation by using an inactive medium for removal.

I do not think the defendant's point is well taken. The patentee was pointing out a danger which might arise from too great heat and too much oxidation—the melting point of lead is only 330 degrees C. There is no reason to believe that in providing for a cooling apparatus to radiate the heat he was intending to do more than guard against that danger. Nor is "radiate the heat" to be read as meaning "radiate all the heat." It is entirely proper to speak of the cooling system of an automobile as radiating the heat generated by the engine, though no one imagines that it radiates all the heat or that it does more than prevent overheating. In order to give to these three words, in the description of a system the essence of which is friction, the interpretation which the defendant puts upon them, it seems to me that it would, at the very least, be necessary to find some definite expression of the thought that oxidation per se was detrimental. No such statement appears.

To fortify his contention, the defendant points out that the specification teaches

that 100 kilograms of lead balls produce 100 kilograms of fine powder, and argues that this indicates that the added weight of the oxygen atoms cannot be present in the powder. This argument, however, overlooks the unavoidable loss in the collection of the dust as it comes out of the drum.

The defendant also contends that the Supreme Court has already adjudicated this phase of the patent when it said, "Its ['149's] claims cover merely a process for the production of a finely divided chemically reactive lead powder by introducing relatively large masses of lead into a rotatable vessel, rotating the vessel at a relatively low speed, forming the powder by attrition resulting from the rubbing of the masses against each other, and blowing the powder from the vessel by a current of air." [307 U.S. 5, 59 S.Ct. 684, 83 L.Ed. 1071].

I am quite sure that the Supreme Court did not intend to make any ruling affecting the validity of '149. Had that been the true purpose, the direction to me would have been to proceed, not only in the light of the "dismissal as to those patents," but also, "in the light of this opinion," or something of that sort. The Supreme Court was indicating exactly what this court was to do. The purpose of its order was to direct this court to reconsider a question which, plainly, this court had not given a great deal of attention to, pointing out that the '150 and the 1,896,020 patents were out of the way by reason of prior public use, but leaving this court entirely free on all phases of the question of '149's validity. Specifically, I do not think that the Supreme Court meant to hold that '149 did not disclose heat and oxidation.

Besides, if the sentence was intended to mean what the defendant says it does, "merely" would be a misplaced modifier. The court said that the patent covered "merely a process." Several of the patents in suit claimed product and apparatus as well as process. The court did not say, "Its claims cover a process for the production of * * * powder merely by introducing * * * etc. * * * *" or " * * * merely blowing the powder from the vessel by a current of air." The distinction in meaning is apparent.

Concededly, '150 teaches the use of air and heat for the purpose of oxidation. So far as the testimony in this case is concerned, I do not find any expression of opinion on the part of the defendant's experts that '149 differs from it in that particular. Dir. Woodbridge, the defendant's chief engineer and an expert, said, "In United States patent 1,584,150 a temperature between 60° and 200° C. is mentioned. In U. S. patent 1,584,149 no mention is made of temperature in the process, but in my opinion, as a result of the process described, the elevated temperature within the limits specified in U. S. patent 1,584,150 would unquestionably arise." And again, "I do not find in either patent '149 in suit or in Exhibits 111 and 112 any limitation upon the amount of oxidation which might take place in either of those three patents."

■ Inasmuch as '149 does not eliminate heat or forbid oxidation, it cannot be said that the process is the same as that of Japanese patents 41,728 or '563. '728 does not provide an air blast at all, and, while it might produce some small amount of powder (quality not determined), totally missed the quantity production which is of the essence of the process and which can be accomplished only by an air blast. As to '563, there is a great difference between preventing any oxidation taking place by using an inert gas to remove the dust, and merely radiating the heat of friction by means of a cooling apparatus. I am convinced that '563 must be read as a disclosure of the use of an inert or inactive medium which will not oxidize lead, and as nothing more. I am unable to advance any satisfactory reason why the inventor should have mentioned air as an example of an inactive gas, but he certainly did so. The language of his claim in '563 was "blowing currents of air or other inactive gases into the vessel * * * to force the small particles * * * out." It was demonstrated that, in an inert medium, the balls simply polish one another and no powder will be produced; so even if the claim could be construed by omitting the word "other" and read, "air or an inactive gas," as though they were alternatives, it would be wholly invalid because it would then suggest two inconsistent and mutually exclusive methods, one of which might lead to a useful result and the other of which would lead to nothing. A patent, like any other instrument, may be of doubtful meaning, or it may contain several meanings applicable to varying conditions, but it may not have two meanings inconsistent with each other.

Whatever the inventor did or did not know about the way in which the atoms of oxygen attacked the surface molecules of the lead balls, he did know before his application for '149 that when he used an air blast in his rotating drum he got large quantities of the desired powder. He also knew that there was heat in the mill and consequent oxidation. He was afraid that there might be too much heat and consequently provided a cooling apparatus. This, it seems to me, is the plain meaning of the specification of '149.

By the time the inventor came to apply for '150 he thought that he knew a great deal more about the chemical reaction which lay at the heart of his method, and he set it out in his specification. Rightly or wrongly, he believed that the oxidation of the surfaces of the balls resulted in the formation of a chemical substance called lead suboxide (Pb$_2$0) and included that in the theory of the reactions and in certain of the claims. It was not demonstrated in the original hearings of this case that there was any such substance as lead suboxide known to science, and consequently the product claims were held not infringed.

What '150 adds to the process is the development of the idea of temperature control. In some of the claims, permissible ranges of temperature are given as between 60 degrees C. and about 200 degrees C. I think, however, that the disclosure of '149 is quite sufficient to make it possible for anyone skilled in the art to arrive at that point by ordinarily intelligent practice of the method. It takes no inventive qualities to know that, until the balls are immobilized by centrifugal force, the faster you turn the drum the higher the temperature will become and that the more air you blow into it the faster will be the oxidation. The matter of finding the precise temperature that will produce the optimum product is merely a matter of experimentation quite within ordinary engineering skill.

Patent '149 concededly was applied for before the ultimate details of the process had been worked out. In the development of the invention it stands somewhere between '563, which provided against the very step which made successful operation possible, and '150 with its precise teaching as to the chemical reactions which underlay the invention and its added instructions as to temperature control and ranges. It must belong to one or the other of the two stages of development represented by these two patents. The dividing line is a sharp one. Either the patent represents no advance whatever over '563, or it realizes the fundamentals of the procedure of '150. As has been pointed out, it was applied for at a time when the inventor knew what made the process work, but probably did not know how or why. It seems to me that the logic of the situation assimilates the patent to the later rather than the earlier stage, and that it is much more reasonable to conclude that '150 was an elaboration of what was inherent in '149 than to hold that '149 was merely a repatenting of the useless process of '563. There may have been some reason why the inventor, even with the knowledge that it would not give the desired result, should have wished to patent a non-oxidizing process once. There can be no reason why, with knowledge that oxidation was the key to success and with a plant embodying the process actually in operation, he should have ignored all that and proceeded to patent the non-oxidizing process a second time.

Having determined that the invention disclosed by claim 2 of '149 is substantially the same as that of '150, what was said by this court in the first opinion in dealing with the prior art patents to Bailey and others is fully applicable and need not be repeated here. In considering them it should be borne in mind that none, so far as the evidence shows, made any impression upon the art, while the plaintiff's process has effected a fundamental change in an important industry. I am of the opinion that the prior art does not invalidate this claim, which is patentable over any combination of prior art references.

■ The defendant argues that an amendment made by the plaintiff in his specification in the course of the procedure in the Patent Office introduced new matter and, having been allowed without supplemental oath, invalidates the patent. This point was not pleaded in the answer nor raised at any time heretofore, either before this court of the Circuit Court of Appeals or the Supreme Court. If I thought it was a valid objection, I would reopen the hearing for the purpose of permitting the plaintiff to offer such additional testimony as he might have to meet it. But I do not think that is necessary.

The patentee's original specification (not the claim) says "The cylinder is caused to rotate at a rate of 15–25 times per hour." Amendment was permitted to change this

to "15–25 times per minute." Obviously the original application contained a typographical error. Apart from this, however, an amendment is not new matter requiring supplemental oath, if it contains something which can be deduced from the original specification. It seems perfectly obvious that the original specification, which provides against a possible heat of friction sufficient to melt the lead cannot limit the "relatively low speed" of the claim to any such absurdly low rate of revolution. Not only this, but the whole idea of the specification, and the claim, is the production of powder by "abrasion and pulverization of the lumps." It needs no expert testimony to see that one revolution of a 60-inch drum every three or four minutes would produce so little powder that the method would be, to all intents, inoperative. The whole specification flatly negatives any such rate as originally given, and a rate of revolution, relatively slow, but sufficient to abrade the surfaces of the lead and cause them to get hot may be fairly deduced from it and is inherent in it.

As was said in General Electric Co. v. Cooper Hewitt Electric Co., 6 Cir., 249 F. 61, 63, 64, "The Patent Office has made a strict rule on this subject. It fully recognizes that new matter must not be permitted, and it is constantly engaged in defining what is and what is not new matter. The application of the rule must, of necessity, be more or less arbitrary, and the presumption of correctness which attends Patent Office rulings must apply with especial force to this class of ruling."

▮▮▮ The defendant's operation infringes the process claimed in Claim 2 of '149. The last step of the process claimed is "removing the said powder from said vessel by means of said current of air." Dr. Wilson's report shows that the greater part of the defendant's product will, when the air blast is shut off, ultimately leave the rotating vessel by gravity or by pressure from its remaining contents. However, the mere fact that the function of removal can be performed without using air by no means proves conclusively that air, when used, does not perform that function to a substantial degree. Moreover, Dr. Wilson's report also shows that the quantity removed by the defendant's air current is by no means negligible. The defendant's system of dust collection is also an indication that the amount is more than a negligible portion.

Claim 2 of patent '149 is therefore held valid and infringed.

Claim 1 does not include the air blast. Unless limited by the specification, it is invalid by reason of the prior art. I do not think it possible to amend it by the specification in so fundamental a manner, and therefore it is held invalid.

The statements of fact and law contained in the foregoing opinion may be taken as special findings and conclusions.

Judgment for the plaintiff.

Additional Findings and Conclusions.

In response to the plaintiff's requests, the following additional special findings of fact and conclusions of law are made:

### Findings of Fact.

1. The application for United States Letters Patent No. 1,584,149 was filed January 30, 1922, and the patent issued May 11, 1926, to Genzo Shimadzu, now the lawful owner, co-plaintiff herein.

2. Northeastern Engineering Corporation, co-plaintiff herein, is the exclusive licensee under said patent.

3. The invention described in the United States Letters Patent No. 1,584,149 discloses a process which involves the use of an air current. Although it does not, in express language, refer to or suggest the oxidizing effect of the air upon the lead, that reaction is inherent in the disclosure. In the light of the disclosure, no more than ordinary operating skill is needed to supply the elements of control of air current and temperature.

4. The Japanese Patent No. 42,563, is directed to a process which consists in utilizing merely an inactive gas to remove product from the mill.

5. Claim 1 of the United States Letters Patent No. 1,584,149 does not specify any air blast.

6. The process set forth in Claim 2 of United States Letters Patent No. 1,584,149 is not for the same invention as disclosed or claimed in Japanese Patent No. 41,728 or Japanese Patent No. 42,563.

7. The invention of Claim 2 of United States Letters Patent No. 1,584,149 is not disclosed by the United States Letters Patent to Bailey No. 846,384, to Fullman No. 1,174,975, or Peters 1,441,168, or the French Patent to Thibault No. 494,270, or the British Patents to Bischoff No. 11,602 of 1890 and No. 13,202 of 1898.

8. The invention of Claim 2 of United States Letters Patent No. 1,584,149 was not patented or described in a printed publication in this or any foreign country prior to the filing of the application.

9. The invention of Claim 2 of United States Letters Patent No. 1,584,149 is not disclosed in any of the prior art.

10. The invention of Claim 2 of United States Letters Patent No. 1,584,149 was not embodied in the alleged use of the Tudor Mill.

11. The steps set forth in Claim 2 of United States Letters Patent No. 1,584,149 are operative, have utility, and constitute patentable invention.

12. The application for United States Letters Patent No. 1,584,149 as originally filed discloses a speed of rotation for the mill sufficient to abrade the surfaces of the lead lumps introduced into "a slowly rotating vessel." A speed substantially greater than 15–25 rotations per hour is inherent in and plainly indicated by the original specification. The change in the application in reference to the speed, made January 4, 1926, simply corrected a typographical error. Such change in the application was not pleaded or raised as a defense nor presented prior to the hearing after remand, nor referred to in any of the oral or printed arguments prior thereto.

13. In the operation of the defendant's process it is necessary to introduce a current of air into the rotating vessel, one of the steps in the process set forth in Claim 2 of United States Letters Patent No. 1,584,149.

14. Powder formed in defendant's mill is removed therefrom by the current of air employed in defendant's process.

15. Defendant has since June, 1921, been using a process embodying all of the steps set forth in Claim 2 of United States Letters Patent No. 1,584,149.

16. The product of defendant's process is a finely divided chemically reactive lead powder of such fineness and activity as to be readily changed chemically on contact with air.

17. The product of defendant's process is that resulting from the employment of the process set forth in Claim 2 of United States Letters Patent No. 1,584,149.