ELECTRIC STORAGE BATTERY CO. v. SHIMADZU et al.

SHIMADZU et al. v. ELECTRIC STORAGE BATTERY CO.

Nos. 7602, 7626.

Circuit Court of Appeals, Third Circuit.

Nov. 19, 1941.

Rehearing Denied Dec. 19, 1941.

Further Rehearing Denied Jan. 5, 1942.

See, also, 30 F.Supp. 865.

Edmund B. Whitcomb, of Toledo, Ohio, and George Whitefield Betts, Jr., of New York City (Hunt, Hill & Betts, of New York City, Edmund B. Whitcomb, of Toledo, Ohio, and Rawle & Henderson, of Philadelphia, Pa., George H. Souther, of Toledo, Ohio, George Yamaoka, of New York City, and Joseph W. Henderson, of Philadelphia, Pa., on the brief), for plaintiffs.

Hugh M. Morris, of Wilmington, Del. (Augustus B. Stoughton and E. S. W. Far-

892

num, Jr., both of Philadelphia, Pa., Augustus B. Stoughton, of Philadelphia, Pa., A. F. Kwis, of Cleveland, Ohio, and E. S. W. Farnum, Jr., of Philadelphia, Pa., on the brief), for defendant.

Before BIGGS, CLARK, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

Genzo Shimadzu and another sued The Electric Storage Battery Company, alleging the infringement of six patents for the production of fine lead powder suitable for use upon the plates of storage batteries or for the manufacture of paint. The District Court held all of the claims of the patents in litigation valid and furthermore held claims 1 and 2 of Patent No. 1,584,149, claims 1 to 4, 6, and 8 to 13 of Patent No. 1,584,150 and claims 10 and 11 of Patent No. 1,896,020 to be infringed. The court held all other claims in issue of the patents to be not infringed. See 17 F.Supp. 42, 53, 54. An appeal was taken to this court and the decision of the court below was affirmed in a per curiam opinion. See 98 F.2d 831. A petition was filed in the Supreme Court of the United States, which granted certiorari.

The Supreme Court in its decision, Electric Battery Co. v. Shimadzu, 307 U.S. 5, at page 8, 59 S.Ct. 675, at page 679, 83 L.Ed. 1071, passed upon three questions. Mr. Justice Roberts stated them as follows, "[1] In an infringement suit by the owner of a patent for an invention, made but not patented or published abroad, to restrain an innocent use, the inception of which antedates the application for patent, may the plaintiff prove that his actual date of invention was earlier than the commencement of the asserted infringing use? [2] Is the delay of the patentee * * * in applying for patent a bar to relief for alleged infringement? [3] Does commercial use of the patented process and apparatus in the alleged infringer's plant for more than two years prior to the application for patent preclude redress?" The Supreme Court answered the first and third questions in the affirmative and the second question in the negative. It found, construing R.S. §§ 4886, 4887 and 4923, 35 U.S.C.A. §§ 31, 32, 72, that the criterion of novelty required before a patent can issue from the United States Patent Office is "* * * the same whether the invention was conceived abroad or in this country. The test is

whether the invention was 'known or used by others in this country, before his invention or discovery thereof' * * *"; that the foreign inventor is entitled to the filing date of his application in the foreign country provided his domestic application is filed within twelve months of the foreign filing date; and that a patent "* * * shall not be refused or held void by reason of the invention having been known or used in a foreign country, before his invention or discovery, if it had not been patented or described in a printed publication."

The court also held that abandonment under R.S. § 4920, 35 U.S.C.A. § 69, is an affirmative defense which must be pleaded and proved and that since abandonment was not pleaded in the trial court, that defense could not be asserted successfully upon appeal.

■ Specifically the court determined that Patent No. 1,584,150 was invalid because of prior public use of the invention disclosed by it in this country prior to the filing of the application in the United States and that like prior public use had been pleaded and proved in respect to Patent No. 1,896,020 which was likewise invalid. The Supreme Court reversed the decree of this court and remanded the cause to the District Court with directions to dismiss the bill as to '150 and '020. As to Patent No. 1,584,149 the Supreme Court directed the District Court "* * * to proceed, in the light of the dismissal as to those patents, ['150 and '020] to determine whether 1,584,149 is valid and infringed."

As we have already indicated, the District Court in its original opinion held claims 1 and 2 of '149 valid and infringed, but dealt with this patent rather briefly "* * * for the reason that, '150, being the narrower patent, if it was infringed, '149 would also be infringed, and hence it made little practical difference to the parties whether '149 was valid or not." See the opinion of the District Court upon remand, 35 F.Supp. 745, 746. The validity and scope of '149 is the sole issue in the appeal at bar.

Upon remand the District Court held claim 2 of '149 valid and infringed and specifically found (Finding of Facts No. 6) that "The process set forth in Claim 2 of United States Letters Patent No. 1,584,149 is not for the same invention as disclosed

or claimed in Japanese Patent No. 41,728 or Japanese Patent No. 42,563." The District Court also found (Finding of Facts No. 5) that "Claim 1 of the United States Letters Patent No. 1,584,149 does not specify any air blast." The learned District Judge found claim 1 to be invalid over the prior art. He stated, page 748 of 35 F.Supp., that he was quite sure that the Supreme Court did not intend to make any rule affecting the validity of '149, and we concur in this view. We think that the Supreme Court expressly left open all questions relating to the validity of '149 or its infringement by the appellant's processes, aside from the defense of prior public use which was held not to have been made out. Not unnaturally a great deal of effort has been expended by the parties in attempting to read into the law of the case as expressed by the Supreme Court support for their respective views. In our opinion, however, the Supreme Court did not decide any issues other than those which we have pointed out. It must be remembered that the Supreme Court did not pass upon questions of invention or prior art. It broke patents '150 and '020 upon prior public use only. We therefore deem all other questions to be open for our review.

No better exposition of Shimadzu's process can be found than those contained in the opinions of the District Court. Nothing can be gained by our attempting to rephrase in other words a description of processes which the trial judge treated at length. It will be necessary to read all the earlier opinions. We will condense what we have to say about the Shimadzu processes and patents into as brief a space as we can, pointing out those particulars in which we disagree with the trial court.

Shimadzu in 1918 got the idea that a fine lead powder suitable for the purposes described in the patent could be made by tumbling lead balls against each other in a revolving container. From his first experiments he seems to have gotten very little fine powder and that which he did get was made by the friction of the lead balls rubbing against each other. He attempted to increase the output with little success by putting a metallic lining in the container and by vertical grinders. He then tried to separate the fine powder out of the heavier in the drum by an air blast. The air blast did remove some of the fine powder from the receptacle, but left the coarse powder undisturbed. In December, 1918, Shimadzu thought of shooting the air blast directly into the drum and at the same time providing the drum with an outlet by which the fine powder could be blown out. Shimadzu thereupon made an air inlet and an air outlet into and out of the drum itself, and he shot air under pressure into the drum while it was revolving.

At this point Shimadzu became the inventor of a new and useful process. As the District Judge stated, page 44 of 17 F.Supp., "It was at once observed that the amount of the product increased tremendously." Shimadzu apparently did not know why it increased as the result of this precise process, but the fact was the air thus shot into the revolving drum formed a layer of lead oxide upon the surfaces of the lead balls which, being brittle, was easily reduced to powder by the friction of the balls against each other. As the District Court succinctly stated, "Full commercial realization of the process did not follow immediately upon the installation of the mill [thus arranged] in Shimadzu's plant * * *. That came only after more experimenting. * * * What was actually being worked out, whether consciously or otherwise, was a second and highly important element of the process, namely, temperature control. Production in satisfactory quantities depended upon abrading the balls to powder as rapidly as possible and that in turn depended upon determining and maintaining a temperature in the mill which would be high enough to produce rapid oxidation, but not so high as to melt the metal or to over-oxidize the product." Judge Kirkpatrick went on to say, page 45 of 17 F. Supp., "The process was unquestionably invented when the idea of blowing an air blast into a rotating mill in which lead pieces were being abraded and keeping the whole at a controlled high temperature by means of regulating speed of revolution and air pressure had been evolved and successfully practiced * * *".

The elements just referred to were embodied in '150 and were and are the vital elements of Shimadzu's process. The specifications of '150 specifically refer to "* * * putting in a rotatable vessel pieces of metallic lead, keeping these pieces at a temperature not less than 60° C., and while rotating the vessel sending air, or other gas containing oxygen there-

894

into, or sending any other oxidizing agent thereinto, thus oxidizing the surface of the peaces of lead and reducing them by abrasion into a very fine powder which is chemically very reactive." Shimadzu also says that the surface of the lead balls gradually becoming oxidized and being covered "* * * with a layer of lead suboxide which is comparatively brittle * * * will be abraded into a fine powder."

In his first Japanese Patent, No. 41,728, Shimadzu speaks of throwing 250 kwans of lead balls having a diameter of one and one half inches each into a rotating cylinder; then rotating the cylinder about twenty-five revolutions a minute, "* * * the lead balls rub on one another and on the inner walls of the vessel, so that they are gradually reduced by friction to small particles, and in an hour's time about 10 kwans of irregular, fine powder is made and can be collected." The specifications of Japanese Patent '728 also state, "An important point of this invention is the reduction of lumps of lead to fine particles in a rotating vessel by their frictional rubbing on one another and on the inner walls of the vessel, while it is rotating, without crushing or smashing the metals as in methods used heretofore; * * *" The claims of the patent are set out below. [1]

Japanese Patent No. 42,563 was considered by Shimadzu primarily as disclosing an improvement upon the process set out in '728, and we think was not deemed by him as containing any very startling innovation over '728. Shimadzu refers to the process of '563 simply as "* * * an improvement of that covered by Patent No. 41,728 * * *." He states that the improvement consists "* * * while rotating the vessel to reduce the lead to small particles by frictional rubbing, [of] blowing in some air or other inactive gases to cause the small particles to fly out of the vessel; and then collecting them." In his detailed explanation of the invention Shimadzu states: "This invention is an improvement over the one covered by patent No. 41,728 and consists of blowing air or some other kind of inactive gas like nitrogen into a rotating vessel, while it is rotating, to forcibly blow out all the particles ground sufficiently small, thus avoiding considerable trouble and eliminating the decrease of the frictional action due to an accumulation of the powder inside the vessel. At the same time, the size of the particles can be governed by the velocity of the gas blowing in." The claims of '563 are set out in the note below. [2]

At this point arises the phenomenon which makes the case at bar a difficult one. The truth is, and it is now well recognized by the parties, that oxide was quickly and efficiently formed upon the plastic surfaces of the lead balls because of the air current thrust into the moving cylinder. If an inactive gas such as nitrogen had been introduced into the rotating vessel, lead oxide would have been formed only in a small quantity and the current of nitrogen would have served simply to blow the

---

[1] "(1) In order to achieve the purpose recorded above, a method of manufacturing chemically reactive lead powder is claimed, a special feature of which is throwing lumps of lead into a rotating vessel and by rotation of the vessel grinding lumps of lead to small pieces.

"(2) In order to achieve the purpose as recorded above, a method of manufacturing chemically reactive powder is claimed which consists in placing round lumps of lead in a rotating vessel and reducing them to small particles by means of the frictional rubbing of the balls on one another and on the inner walls of the vessel when this is rotated."

[2] "(1) In order to achieve the object recorded earlier in this record, a method of manufacturing chemically reactive lead powder is claimed, a special feature of which is throwing lumps of lead into a rotating vessel, and blowing currents of air or other inactive gases into the vessel during rotation to force the small particles produced by rubbing out of the vessel.

"(2) In order to achieve the purpose recorded above, a method of manufacturing chemically reactive lead powder is claimed, as stated in the previous paragraph, which governs the size of the particles by means of the velocity of currents of inblowing air.

"(3) In order to achieve the purpose recorded above, a method of manufacturing chemically reactive lead powder is claimed, as stated in the preceding paragraphs, which provides for continuously or periodically supplying raw material in the form of lumps of lead at a given rate, and blowing out the finished particles by the force of the wind so that the work is done continuously."

lead particles formed out of the receptacle. It would have had no other effect. That Shimadzu had no conception of why he got such large quantities of fine powder when he shot air into the vessel is apparent both from the scope of his claims and from the fact that he refers to the use of air in his process as if it were "* * * some other kind of inactive gas like nitrogen * * *".

It will be observed that the specifications of '563 do note the fact that the fine lead powder formed by the process is liable to ignite spontaneously due to the heat of friction on the inside of the rotating vessel. Shimadzu points out that this possibility is eliminated by "* * * blowing in air or some other inactive gas with a resultant cooling effect * * *". The specifications of '728 contain words almost identical with those quoted.

We come now to specific consideration of the patent sub judice. In his specifications Shimadzu states, "The present invention relates to a method of manufacturing fine powder of a plastic metal, by putting the plastic metal such as lead, in pieces in a rotatable vessel, and rotating the vessel so as to cause friction of the metal lumps with each other and with the inner surface of the vessel thereby effecting the abrasion of the metal pieces." He goes on to say, "The present invention consists in rotating a rotatable vessel, containing lumps of metallic lead, in such a manner that the metal lumps rub against one another, and the inner surface of the vessel, causing abrasion and pulverization of the lumps. The degree of fineness of the powder can be regulated by regulating the quantity of the metal lumps put in the vessel." As a practical example of the method of manufacturing lead powder according to his invention, Shimadzu explains that he fills his rotatable cylinder with five hundred balls of steel one inch in diameter together with one thousand kilograms of lead balls an inch and a half in diameter. He then says, "As the abrasion is going on, the cylinder is replenished with lead ball continuously and at a definite speed at a rate of 100 kilograms an hour, while air blast having a pressure of 2.5 pounds per square inch, is sent out of the air-blower." He had made it plain theretofore that his cylinder was to be fitted with "* * * an air-blower provided with small holes * * *" and that one end of the cylinder was to be provided with an orifice for feeding in the material and the other end with an opening to discharge the product.

The specifications provide that the cylinder is to be rotated at the rate of fifteen to twenty-five times a minute and that, "On account of this rotation of the cylinder, the lead balls contained therein get abraded and pulverized into very fine powder, which is blown out of the cylinder through the discharge orifice by means of the air blast from the said blower, and the lead powder thus blown out is led into a suitable chamber and collected there." Shimadzu goes on to say, "In short, the present invention does not crush, grind or file metals, but reduces them into powder by abrasion, pieces of the metal to be pulverized being put in a slowly rotating vessel, and caused to rub against one another and the wall of the vessel." There are only two claims in the patent.[3]

It will be noted that Shimadzu discloses no apparent knowledge of why his process was so successful. He does not seem to apprehend that the real basis for the success of his process was the oxidation caused by the air blast into the cylinder. He does refer to temperature control. He is aware that the lead powder made by him oxidizes easily and will ignite spontaneously and provides a cooling apparatus to radiate the heat. He speaks also of

[3] They are as follows:

"1. A method of forming a finely divided chemically reactive lead powder of such fineness and activity as to be readily changed chemically on contact with air, which comprises introducing relatively large masses of lead into a rotatable vessel, rotating said vessel at a relatively low speed and forming said lead powder by attrition of said lead masses resulting from the rubbing of said masses against each other.

"2. A method of forming a finely divided chemically reactive lead powder of such fineness and activity as to be readily changed chemically on exposure to air, which comprises introducing relatively large masses of lead into a rotatable vessel, rotating said vessel at a relatively low speed, introducing a current of air into said vessel, forming said lead powder by attrition of said lead masses resulting from the rubbing of said lead masses against each other, and removing the said powder from said vessel by means of said current of air."

the cooling effect of the air or gas attributing to them the same effect as the heat-insulating processes referred to in Japanese '728 and '563. But if Shimadzu did grasp the vital reason for the success of his process, he certainly did not refer to it.

We think that despite this apparent lack of knowledge as to why his process worked, the disclosures of '149 considered in the light of the prior art (disregarding the Japanese patents) constituted invention of a high order. Shimadzu discloses a new and commercially useful method for making the fine metallic powder for batteries. There were no comparable disclosures in the art in the United States. By blowing air into the cylinder Shimadzu revolutionized the art of making fine lead powder.

The patent sub judice issued on May 11, 1926, upon an application filed January 30, 1922. Japanese Patent No. 42,563 issued on May 10, 1922, upon an application filed November 27, 1920. Japanese Patent No. 41,728 issued on February 13, 1922, upon an application filed November 21, 1920. R. S. § 4887, 35 U.S.C.A. § 32, provides in part that "No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid by reason of its having been first patented * * * by the inventor * * * in a foreign country, unless the application for said foreign patent was filed more than twelve months, * * * prior to the filing of the application in this country, in which case no patent shall be granted in this country."

Since the application for '149 was filed in this country fourteen months after the filing of the Japanese applications, it follows that if the application for '149 discloses the same invention as '728 and '563, the patent was issued by the United States Patent Office without sanction of law and is invalid. '728 very plainly is not for the same invention as that claimed in the second claim of '149 since there is no reference whatsoever to any air current. The primary question for our determination,

therefore, is whether '149 is for the same invention as that disclosed in '563. We will deal with the question of the first claim of '149 in respect to '728 at a later point in this opinion.

Is there substantial identity between '563 and '149 in the respects indicated? As we have stated the latter patent omits the qualifying phrase as to nitrogen or some other inactive gas. The learned District Judge stated, 35 F.Supp. 748, "I am convinced that '563 must be read as a disclosure of the use of an inert or inactive medium which will not oxidize lead, and as nothing more". If we accept this statement as correct, it is obvious that we must find that '149 and '563 do not disclose and claim the same invention.

Before we proceed to discuss this vital question it should be noted (without the slightest intention to convey any criticism thereby) that both the court below and counsel for Shimadzu have changed their positions in respect to the scope of '149. In his earlier opinion, 17 F.Supp. 42, 45, Judge Kirkpatrick stated in regard to this patent, "The air current is introduced into the vessel for the purpose of removing the powder formed by attrition of the lead masses. This patent contains no suggestion of the oxidizing effect of the air, or of temperature control." [4] Upon the original hearing counsel for Shimadzu contended in their brief, "* * * It is clear that the '150 patent is patentable over the '149 patent as the latter discloses no oxidation, nor is there any temperature disclosed." In his opinion upon remand, page 747 of 35 F.Supp., the learned District Judge takes a different view and states that he does not believe, "* * * that an operator, using the process of '149 faithfully and with reasonable skill, could avoid getting commercially available quantities of lead powder of the desired quality—the result of '150." Counsel for Shimadzu made an argument to like effect before this court.

■ The foregoing is of importance because we agree with the view expressed

[4] At that time the minds of both court and counsel were not directed primarily to '149 but to '150 and the nature of the issue in respect to '150 made the issue in respect to '149 comparatively immaterial. Judge Kirkpatrick stated, page 53 of 17 F.Supp., "Whether or not '149 is for the same process as U. S. patent '150 is immaterial, so far as the question of validity of either is concerned. There is no double patenting involved. The two patents issued on the same day. They both expire on the same day. There can be no extension of the monopoly and one is not prior art against the other."

897

by the District Court that '149 discloses an operable process, the same invention claimed in '150, and this serves to limit the issues before us. We think that precisely as an operator skilled in the art would have obtained commercially valuable results if he had followed the disclosures of '149 and '150, he would obtain similar results by following the teachings of '563. Admittedly an inventor can supply his own vocabulary as to specifications and claims and to a degree bind the art upon them, but we are also of the opinion that in the disclosures he may not transcend physical laws. For example the patentee may assert that water will run uphill or may deny that heat will raise temperature or that oxygen will oxidize lead, but a court construing the teachings of his patent must construe them in accordance with the laws of physics or chemistry. This is how the individual skilled in the art will construe them.

■ ■ Applying this principle to the facts of the case at bar, we find that Shimadzu in effect has asserted and claimed in '563 that air is an inactive gas under physical circumstances which require it to be active by the very law of its being. It follows that while Shimadzu may specify that the air forced into a cylinder was to be inactive, a court must construe it as an active gas or disregard the common knowledge that heated oxygen will combine with lead to form lead oxide. An inventor is not required to know why his invention works, but if it does work he is entitled to the monopoly conferred by R. S. § 4886, 35 U.S.C.A. § 31. If, on the other hand, he discloses and claims the invention by an application in a foreign country more than twelve months prior to his application in the United States and gains a patent upon the foreign application, he will incur the bar imposed by R.S. § 4887, 35 U.S.C.A. § 32. Shimadzu disclosed and claimed the very essence of his invention in '563, viz., a current of air shot into the moving cylinder plus a measure of heat control.

■ While we think that the phrase contained in '563 "or some other kind of inactive gas, like nitrogen" may serve to qualify the word "air" which immediately precedes it, even if this were not so and the quoted phrase be given a separate and distinct meaning apart from its context and unconnected with the preceding word "air,"

Shimadzu, none the less, disclosed a process which was as fully operable to a person skilled in the art as that disclosed by '150. In fact in '563 the inventor has claimed two processes: one, operable to produce substantial quantities of lead powder; the other, inoperable to that end. We think that it cannot be presumed that one skilled in the art would choose the inoperable process in preference to the operable one. The operable process requires the use of a gas, the presence of which is as inescapable in Japan as in the United States. The inoperable process would require that the operator procure nitrogen in a pure form. We cannot assume that a reasonably skillful person making use of a process intended to be successful commercially would employ a special gas in preference to the air he breathed, the employment of the latter being the primary teaching of the patent. We think that where an operable process is claimed in a patent with an inoperable one, the operable process must be held to constitute the invention. If '563 had been issued in this country we think that Shimadzu would have been entitled to a monopoly in the field. In conclusion upon this interesting and difficult question we point out that it must always be borne in mind that the person skilled in the art is under no greater obligation to understand why the process described in a patent works than is the inventor himself.

■ The process claimed in claim 2 of '149 is substantially identical with that claimed in the claims of '563. The specifications of the two patents are also substantially identical.

Claim 1 of '149 is for substantially the same process as that claimed in the claims of '728.

It follows that both claims of '149 must be deemed to be invalid. In making this statement we are not unaware of the decision of this court in Altoona Publix Theatres v. American Tri-Ergon Corp., 3 Cir., 72 F.2d 53. We do not deem that case to hold that there must be precise and exact identity between the specifications and claims of a United States and a foreign patent in order that the bar of R.S. § 4887, 35 U.S.C.A. § 32, may be applicable. We think that the rule there enunciated as well as in the decision of the Supreme Court in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S.

301, 29 S.Ct. 495, 53 L.Ed. 805, requires simply substantial identity.[5] It is true that a heavy burden of proof rests upon a defendant to show identity, General Electric Co. v. Alexander, 2 Cir., 280 F. 852, but in our opinion that burden has been met in the case at bar.

In reaching this conclusion we are not unmindful that the Supreme Court stated in its opinion, 307 U.S. at page 21, 59 S.Ct. at page 684, 83 L.Ed. 1071, "Its ['149's] claims cover merely a process for the production of a finely divided chemically reactive lead powder by introducing relatively large masses of lead into a rotatable vessel, rotating the vessel at a relatively low speed, forming the powder by attrition resulting from the rubbing of the masses against each other, and blowing the powder from the vessel by a current of air." Despite this statement, the learned District Judge found that the Supreme Court did not intend to rule upon the validity of '149. If we did not concur in this view we would not have written this opinion, but if the claims of '149 be construed as the defendant contended in the court below they must be construed because of the quoted statement of the Supreme Court, it is obvious that Shimadzu has incurred the bar imposed by R.S. § 4887, 35 U.S.C.A. § 32. This is so because the conclusion is inescapable that if the function of the air current in '149 is nothing more than the removal of powder from the vessel, the use of "air or some other kind of inactive gas, like nitrogen" in '563 may be held to serve no other purpose and the processes of '149 and '563 must be deemed to be identical.

Apart from all of the foregoing, however, we concur in the ruling of the court below that the process disclosed by claim 1 of '149 is invalid in view of the prior art.

As to infringement we have carefully examined the contentions of The Electric Storage Battery Company that its processes do not infringe those claimed in claim 2 of '149 and have reached the conclusion, as did the court below, that if claim 2 is valid, the defendant has infringed it.

The other defenses asserted by the defendants do not require discussion in this opinion.

The judgment of the court below is reversed and the cause is remanded, with directions to dismiss the bill of complaint.

GOODRICH, Circuit Judge (dissenting).

With the development of propositions in this case which lead up to the ultimate issue, I entirely agree and think the analysis clear and complete. If there were no question involved concerning Japanese patents 41,728 and 42,563 I take it that United States patent 1,584,149 would be valid, since in the words of the majority, it "constituted invention of a high order". My difficulty arises in the conclusion that '149 has been disclosed by Japanese '563. If this is right, the conclusion that '149 is invalid must be accepted for the reasons stated in the majority opinion.

The District Court thought that '563 must be read "as a disclosure of the use of an inert * * * medium * * * and * * * nothing more". The majority opinion rightly says that if this is correct '149 and '563 do not disclose the same invention. We all agree that an inventor is not required to know why his invention works if, in fact, he has produced invention. But did Shimadzu in '563 offer invention? Could it not equally be said, as the learned District Judge thought, that he was at that time still working on the notion that all he needed was temperature control and removal of lead particles by "wind" from an inactive gas? The majority opinion says that one skilled in the art would construe the teachings of the patent in accordance with the laws of physics and chemistry. But Shimadzu, himself, was not, at that time, construing his own teachings that way. In fact he was, it is believed, not clear about what he wanted to teach. Or, at best, he was teaching something which was of little importance, that is, temperature control and particle removal from a rotating drum by mechanical action of an inactive gas.

I do not see why it follows that if '563 be said to disclose two processes that one

[5] Upon the question of substantial identity in respect to the bar imposed by R. S. § 4887, 35 U.S.C.A. § 32, see also United Shoe Mach. Co. v. Duplessis Shoe Mach. Co., C.C., 148 F. 31, 34, 35, affirmed, 1 Cir., 155 F. 842; Thomson-Houston Electric Co. v. McLean, 1 Cir., 153 F. 883, 889; Commercial Acetylene Co. v. Searchlight Gas Co., C.C., 188 F. 85, 88.

skilled in the art would choose the operable one. It might be argued with equal plausability that he would choose the inoperable one in the belief that it was safer. That is, he might doubt the point that air would be inactive under the circumstances, but feel that nitrogen surely would. And in view of the existing art, the use of any wind blast would be an improvement.

It seems to me, therefore, it may well be said that Shimadzu had not got down to the substance of his invention in '563 and that what was said there and in '149 are not substantially identical. At least it seems to me sufficiently doubtful and difficult to find the identity which the majority opinion, itself, states must be established. I cannot but think that Shimadzu would have had a bad time if the American patent had been issued in the terms of '563 and been subsequently attacked. If he could not have upheld it then, it seems to me that it should not stand in his way now.